LISA GRANT et al., on Behalf of Themselves and All Others Similarly Situated, Respondents, and CAROLYN LEE et al., on Behalf of Themselves and All Others Similarly Situated, Intervenors-Respondents, v MARIO M. CUOMO, as Governor of the State of New York, et al., Defendants, and EDWARD I. KOCH, as Mayor of the City of New York, et al., Appellants.

First Department, July 9, 1987

## APPEARANCES OF COUNSEL

*Frederick P. Schaffer* of counsel *(Grace Goodman* with him on the brief; *Frederick A. O. Schwarz, Jr., Corporation Counsel,* attorney), for appellants.

*Raymond L. Falls, Jr.,* of counsel *(Vivien B. Shelanski, Ellen L. Weintraub* and *Irene S. Cannon-Geary* with him on the brief; *Cahill, Gordon & Reindel* and *Robert M. Hayes,* attorneys), for respondents and intervenors-respondents.

## OPINION OF THE COURT

SANDLER, J. P.

In an action seeking injunctive and declaratory relief originally commenced by four families and three organizations, the plaintiffs claim that the several defendants have violated their obligations to provide protective and preventive services under the Child Protective Services Act of 1973 and the Child Welfare Reform Act of 1979. The complaint alleged in substance with regard to the family plaintiffs, and other families said to be similarly situated, that the several defendants had failed to make available to families with children at risk of removal to foster care preventive services mandated by law that were required to permit those children to remain with their families. The complaint further alleged that the several defendants had failed to comply with their statutory obliga-

tion to provide protective services to children in danger of child abuse and maltreatment.

Following a court conference with counsel, the original families withdrew as party plaintiffs on their agreement that the defendants had satisfied their individual claims to preventive services. Thereafter, two other families asserting substantially the same claims sought, and were granted, permission to intervene.

The defendants appeal from an order dated May 27, 1986 of the Supreme Court, New York County, to the extent to which it (1) granted the motion of the intervenors-plaintiffs for a preliminary injunction requiring the city defendants to prepare service plans within 30 days, and thereafter to provide all services recommended in such plans, (2) granted the motion of the organizational plaintiffs for a preliminary injunction requiring the city defendants to commence investigations of reports of suspected child abuse or neglect within 24 hours of the receipt of such reports, and (3) denied the motion of the city defendants for summary judgment dismissing the complaint (134 Misc 2d 83). The city defendants also appeal from an order entered August 7, 1986, which granted their motion to renew, but thereupon adhered to the court's original determination.

The issues on this appeal concern the interpretation and enforcement of two major pieces of legislation in the area of child welfare—the Child Protective Services Act of 1973 (Social Services Law § 411 *et seq.),* which regulates the provision of protective services to abused and maltreated children, and the Child Welfare Reform Act of 1979 (Social Services Law § 409 *et seq.),* which regulates the provision of preventive services to children.

Protective services refer to the system for reporting and investigating cases of suspected child abuse or neglect and for protecting children and providing rehabilitative services to them and their parents. (Social Services Law § 411; 18 NYCRR part 432.) Preventive services are supportive and rehabilitative services designed to avert the placement of children in foster care, to enable children in foster care to return to their families at the earliest possible date, or to reduce the likelihood that children who have been discharged from foster care will be returned to it (Social Services Law § 409 *et seq.;* 18 NYCRR parts 423, 430.9).

The legal issues presented with regard to the alleged failure

of the defendants to discharge their duties under the two controlling statutes are fundamentally different in character.

As to the claimed violation of the city defendants to comply with their statutory duty to provide protective services, it is agreed that Social Services Law § 424 (6) requires each child protective service, upon receipt of a report of suspected child abuse or maltreatment, "to commence, within twenty-four hours, an appropriate investigation", and that in a certain percentage of cases, the exact per cent being a matter of disagreement, the city defendants have failed to comply with that statutory direction. The issues with regard to this part of the court's order are raised by the city's contention that the organizational plaintiffs lack standing to maintain the action, and that under all the circumstances, the issuance by Special Term of an injunction requiring full compliance with the statutory provision represented an improvident exercise of discretion.

As to that part of the court's order addressed to the claim of the intervenors-plaintiffs for preventive services, the central issues presented concern the interpretation of the relevant sections of the Child Welfare Reform Act of 1979. The first and most fundamental question is whether, as contended by plaintiffs and implicitly held by Special Term, Social Services Law § 409-a, when considered together with the regulations promulgated by the New York State Department of Social Services (18 NYCRR 423.2 [d]; 430.9), imposes an unconditional nondiscretionary obligation to provide preventive services under certain circumstances defined in the regulations.

The second issue of construction is raised by Special Term's determination that a child service plan, which a social services district is required under Social Services Law § 409-e to prepare with respect to each child identified as being considered for placement in foster care, is in the nature of a contract enforceable by a court, and that the city is obligated to provide all available services recommended in that plan subject only to its right under subdivision (3) to revise the plan from time to time.

Turning first to the issues raised by the city's conceded failure fully to comply with its obligation to commence investigations of reports of child abuse or maltreatment within 24 hours, we recognize that the factual demonstration by the organizational plaintiffs in support of their standing to seek judicial relief is unimpressive when considered in light of the

established requirement that such organizations demonstrate that they have suffered an injury as a result of defendants' actions. *(See, Matter of Dental Socy. v Carey,* 61 NY2d 330, 334; *Matter of MFY Legal Servs. v Dudley,* 67 NY2d 706.)

■ As the defendants correctly argue, the claim of the organizational plaintiffs to have suffered an injury by way of an added burden on their resources is presented in general terms only. On the other hand, we cannot ignore the obvious fact that if organizations of this kind are denied standing, the practical effect would be to exempt from judicial review the failure of the defendants, here conceded, to comply with their statutory obligations. Manifestly, the abused children are not themselves able to seek a judicial remedy, nor is it likely that parents or caretakers, the objects of the claims of abuse or maltreatment, would undertake to secure a remedy. Given the obvious reality that the protection of abused or maltreated children is a central concern of our society, and given the historic relationship of organizations concerned with the care and protection of children to the goals sought to be achieved by the relevant statute, we are persuaded that Special Term was justified in denying the motion to dismiss as to the organizational plaintiffs.

Turning to the merits of this part of the order appealed from, the city defendants acknowledge their statutory obligation to commence investigations of reports of suspected child abuse or neglect within 24 hours of the receipt of such reports, and their failure to achieve full compliance with the statutory direction. In their appeal from the preliminary injunction requiring compliance with their statutory obligations, the city defendants contend that injunctive relief is inappropriate because they acknowledge their statutory obligations, have steadily increased their rate of compliance, have presently achieved a very substantial compliance with their statutory obligations, and have instituted procedures that will soon bring about the maximum possible compliance. To the extent to which full compliance has not been achieved, it is contended that the failure is attributable in part to human error, inherently not susceptible of being effected by injunctive relief, and a variety of administrative and budgetary circumstances that are inappropriate for judicial intervention.

This branch of the relief sought by the organizational plaintiffs, and granted by Special Term, has its genesis in a statistical report for 1985 that indicated compliance with the obligation to commence investigations within 24 hours in only

89% of the cases, a figure that represented an apparent retreat from the previous year's results and thus apparently belied the claim of ongoing improvement. The city defendants have presented follow-up studies for the year indicating that the 89% figure was in part affected by errors in reporting, and that the probable true figure of compliance for 1985 was 95%. Whether or not 95% is in fact the precisely accurate figure, the follow-up studies do support the conclusion that the true rate of compliance was greater than 89%, and may well have been 95%. But even a 95% figure necessarily means that there were numerically a significant number of reports of child abuse and maltreatment that were not responded to by the commencement of investigations within the statutorily mandated 24-hour period.

The reasons for this ongoing noncompliance cannot be set forth with absolute precision. In part, it may be assumed that some instances are attributable to human error, something not in the usual situation appropriately addressed by injunctive relief. *(Cf., Bruno v Codd,* 47 NY2d 582.) In part, the noncompliance would appear to be the result of a combination of factors set forth in different self-evaluations by the city defendants. These included the failure of budgetary allocations to keep pace with rapidly increasing complaints of child abuse, a high attrition rate among personnel assigned to what is often a difficult and onerous duty, the difficulty of finding and promptly training qualified persons, and possibly failures in communication among the several offices assigned the responsibility.

■ Undeniably, the appropriateness of injunctive relief under the circumstances disclosed in this record presents an issue that is not entirely free from doubt. In the absence of any reason to doubt the good faith of the responsible city agencies, the threat of contempt, the traditional tool for enforcing injunctive relief, would appear to be inappropriate. And the nature of the budgetary and administrative problems detailed in the record does not appear of a kind that courts are well suited to address by specific directions as to how funds should be allocated and as to how the concerned personnel should be organized and supervised. On the other hand, the persistence of an unacceptable degree of noncompliance with a specific statutory direction affecting the welfare of abused children, and the undoubted fact that this lawsuit itself brought about increased governmental concern and attention to the problem, persuades us that there was a suffi-

cient basis for Special Term to conclude that injunctive relief followed by a review of the steps taken by the city agencies to respond would serve a valid purpose.

Turning to the claims of the individual plaintiffs that defendants have violated their statutory obligations to provide preventive services, the central issue is presented by plaintiffs' claim that the Child Welfare Reform Act of 1979 (Social Services Law § 409 *et seq.*), when considered together with the regulations of the New York State Department of Social Services (18 NYCRR 430.9), imposes a nondiscretionary duty in circumstances set forth in the regulations to make findings which mandate the provision of preventive services. Plaintiffs' central thesis is set forth clearly in their appellate brief in the following language: "Respondents have never disputed appellants' discretion as to *which* of a menu of preventive services must be provided under appropriate circumstances. However, respondents do dispute the notion that such discretion extends to the initial determination that a child is at risk of foster care and in need of preventive services."

It is on the basis of this construction of the statute that plaintiffs contend that the issues are controlled by the decision of the Court of Appeals in *Klostermann v Cuomo* (61 NY2d 525), in which the court found legally sufficient a complaint seeking declaratory relief and mandamus on the claim that the State agency had failed to discharge a nondiscretionary statutory duty to provide services, in the face of the contention of the State agency that the failure to discharge its statutory duty resulted from a discretionary administrative judgment as to the allocation of limited budgetary appropriations and was accordingly nonjusticiable.

As becomes apparent on analysis, the construction of the statute urged by plaintiffs is critical both to that part of the court's order that enjoined the defendants to prepare a service plan and provide the services set forth in that plan to the intervenors-plaintiffs, as well as to that part of the court's order that denied the defendants' motion for summary judgment dismissing the complaint to the extent to which it sought system-wide declaratory relief.

If the findings which are a precondition to the obligation to provide mandated preventive services involved discretion and judgment on the part of local social services officials, it is clear that the injunction granted by Special Term, in effect an order of mandamus, violated well-established principles with regard

to mandamus, and that the appropriate remedy of the individual plaintiffs was to seek a review of the denial to them of preventive services in a fair hearing and subsequent judicial review in a CPLR article 78 proceeding if the determination was sustained after the fair hearing. Similarly, if the statutorily required findings involved the exercise of discretion and judgment, it is clear that system-wide declaratory relief would be unavailable since the issues presented would involve separate exercises of judgment and discretion by social services officials in widely varying circumstances.

The purpose of the Child Welfare Reform Act was "to delineate a state policy of providing permanent homes for children who are currently in foster care or at high risk of entering foster care." (Mem of Senator Joseph R. Pisani, NY Legis Ann, at 352.) This purpose was sought to be accomplished by "a new emphasis on preventive services to maintain family relationships and reunite families whenever possible." *(Ibid.)* This new approach was found necessary because "[t]he problems of the foster care system have been exacerbated by a lack of incentives to local district[s] to provide preventive services which may in some cases avert the need for foster care" (Pisani mem, *op. cit.,* at 353).

As further set forth in the Pisani memorandum *(ibid.):* "The bill redefines preventive services and places their provision within an enriched funding formula. The bill delineates clearly standards for planning and caring for children with the goal of permanent homes whenever possible. Furthermore, the bill holds districts accountable for meeting these standards or suffer loss of reimbursement."

Consistent with these purposes, the Child Welfare Reform Act defines preventive services as: "supportive and rehabilitative services provided * * * to children and their families for the purposes of: averting an impairment or disruption of a family which will or could result in the placement of a child in foster care; enabling a child who has been placed in foster care to return to his family at an earlier time than would otherwise be possible; or reducing the likelihood that a child who has been discharged from foster care would return to such care." (Social Services Law § 409.)

With respect to the provision of preventive services, the Child Welfare Reform Act (Social Services Law § 409-a [1] [a]) provides in relevant part: "A social services official shall provide preventive services to a child and his family, in

accordance with the child's service plan as required by section four hundred nine-e of this chapter and the social services district's child welfare services plan submitted and approved pursuant to section four hundred nine-d of this chapter, upon a finding by such official that (i) the child will be placed or continued in foster care unless such services are provided and that it is reasonable to believe that by providing such services the child will be able to remain with or be returned to his family".

Social Services Law § 409-a (2) further provides: "A social services official is authorized to provide preventive services to a child and his family to accomplish the purposes set forth in section four hundred nine of this chapter, when such services are not required to be provided pursuant to subdivision one of this section."

Social Services Law § 409-b (1) provides in substance for reimbursement to each social services district of "(a) seventy-five per centum of allowable expenditures for preventive services provided pursuant to subdivision one of section four hundred nine-a of this title * * * and (b) fifty per centum of allowable expenditures for preventive services provided pursuant to subdivision two of section four hundred nine-a of this title".

Social Services Law § 409-e, entitled "Child service plan", in effect the record-keeping section of the act, provides in substance that the social services district shall perform an assessment of each child and his family circumstances in accordance with procedures and criteria to be prescribed by the Department where the child has been "identified by a social services district as being considered for placement in foster care as defined in section three hundred ninety-two of this chapter" (subd [1]).

Social Services Law § 409-e (2) directs the social services district to establish and maintain a child service plan upon completion of the assessment, which shall include, *inter alia,* identification of required services and their availability and the manner in which they are to be provided.

Social Services Law § 409-e (3) directs review and revision of the plan, in consultation with the parent or guardian, where appropriate, within the first 90 days and at least every six months thereafter. It provides, among other things, that the review shall indicate the types, dates and sources of services that have actually been provided.

Critical to the issue presented is that part of Social Services Law § 409-a (1) (a) which obligates a social services official to provide preventive services to a child and his family in accordance with the child's service plan "upon a finding by such official that the child will be placed or continued in foster care unless such services are provided and that it is reasonable to believe that by providing such services the child will be able to remain with or be returned to his family."

On the face of it, the two findings specified in this section as a prerequisite to the obligation of the social services official to provide mandated preventive services manifestly involve the exercise of discretion and professional judgment, and indeed, the plaintiffs do not argue to the contrary. The plaintiffs' basic contention is that the regulations issued by the State Department of Social Services specify circumstances under which there is an unconditional nondiscretionary obligation on the part of social services officials to make the statutorily prescribed findings.

Although introductory sentences in the pertinent part of the regulations provide some color of support for this construction, a study of the regulation as a whole makes it incontrovertibly clear that it was not intended, and could not possibly have been intended, to impose a nondiscretionary duty on the part of social services officials to make the statutorily required findings under the described circumstances.

18 NYCRR 430.9 (a), as pertinent to the issue presented, provides: "[T]he provision of preventive services shall be considered mandated if one of the following standards * * * is met: the standard for the provision of mandated preventive services to clients at risk of placement".

18 NYCRR 430.9 (c) goes on to provide in its introductory sentence as follows: *Standard for the provision of mandated preventive services to clients at risk of placement.* The provision of preventive services shall be considered mandated when such services are essential to improve family relationships and prevent the placement of a child into foster care. The circumstances in which preventive services shall be considered essential for these purposes are the following".

Undeniably, this phrasing provides apparent support for the plaintiffs' theory that when the circumstances thereafter described are present, preventive services must be provided. What an examination of the specific circumstances thereafter identified makes clear is that this interpretation is untenable. Let us consider the relevant subdivisions in turn.

18 NYCRR 430.9 (c) (1), captioned "Health and safety of child", sets forth a circumstance in which one or more children in a family have been subjected by parents or caretakers, within a 12-month period prior to the date of application for services to serious physical injury by other than accidental means, or to serious impairment or risk of serious impairment of their physical, mental or emotional condition as a result of a failure of the parents or caretakers to exercise a minimum degree of care, and such action by the parents "has resulted in a determination that an allegation of abuse or maltreatment is indicated."

Undeniably, a finding of such abuse would in the usual situation call for consideration by the social services official of removal of the child from the parent or caretaker. But even with regard to that circumstance, it is surely clear, and indeed illustrated in the case records of one of the original family plaintiffs, that there may be many situations in which a finding of abuse is properly made, but in which a professional assessment of the situation as of the time of such finding by a social worker would support the conclusion that the child should not be removed from the parent or caretaker.

Even more clearly, it is apparent that there are many situations in which a parent or caretaker has imperiled the health and safety of the child, and in which it would make no sense whatever to permit the child to remain with the parent or caretaker, and in which no responsible social services official could conceivably find "that it is reasonable to believe that by providing such services the child will be able to remain with or be returned to his family." (Social Services Law § 409-a [1] [a].) It simply could not have been intended to impose a nondiscretionary duty on social services officials to provide preventive services in an effort to avoid foster care every time a finding of abuse and maltreatment of a child by a parent is made.

18 NYCRR 430.9 (c) (2), captioned "Parental refusal", sets forth a circumstance in which the parent or caretaker has refused to maintain the child in the home or has expressed the intention of surrendering the child for adoption.

In this situation, the fact itself would appear to be a simple one, leaving little room for discretion or judgment as to whether such an event has occurred. But it cannot follow from such a circumstance that the social worker must find it reasonable to believe that the provision of preventive services

would avoid the necessity for foster care in every such situation. Undoubtedly there may be occasional situations in which that would be an appropriate conclusion, but it is obvious that in most such situations, it would be absurd to so find. Surely, the regulation *cannot be sensibly interpreted as mandating* the social worker to make the required findings and to provide preventive services to every parent who refuses to maintain the child in the home or is determined to surrender the child for adoption.

The third paragraph, captioned "Parent unavailability", describes a circumstance in which the child's parents or caretakers have become unavailable due to (a) hospitalization; (b) arrest, detainment or imprisonment; (c) death; or (d) the fact that their whereabouts are unknown.

Once again, the circumstance described would seem to involve relatively little room for discretion or judgment as to its presence. But it is not conceivable that it was intended in every situation of parent unavailability described in the regulation that the social services official had a nondiscretionary duty to find it reasonable to believe that preventive services would avoid foster care. Suppose the only parent is under a life sentence in prison, or is dead, or that his whereabouts are unknown. Plaintiffs' interpretation of the regulation calls for a declaration that every such situation imposes a nondiscretionary duty to provide preventive services, and this is surely wrong.

The fourth paragraph, headed "Parent service need", describes a circumstance in which a child is at risk of serious harm "due to an emotional, mental, physical, or financial condition of the parent or caretaker which seriously impairs the parent's or caretaker's ability to care for the child."

As to this circumstance, it is apparent that a determination of the fact of the circumstance by the social services official involves discretion and professional judgment. But let us assume a situation in which it is clear that the described circumstance exists. Can it reasonably be inferred that the social services official *must* find in every such situation that preventive services will avoid foster care? Assume the parent's emotional and mental condition is such that there is no reasonable possibility that the parent can be entrusted with the . child at any time in the foreseeable future. Can the regulation conceivably have been intended, as plaintiffs urge, to require preventive services to avoid foster care in that situation?

The fifth paragraph, headed "Child service needs", describes a circumstance in which a child has special need for supervision or services which cannot adequately be met by the child's parents or caretakers without the aid of preventive services.

On its face, this paragraph clearly involves a professional evaluation as to the existence of the circumstance, which cannot reasonably be construed as ministerial or nondiscretionary.

The sixth paragraph, headed "Pregnancy", describes a circumstance in which "[a] woman is pregnant or has given birth and has shown an inability to provide adequate care for her unborn or infant child." Manifestly, there is no plausible basis for the conclusion that every time a woman is pregnant or has given birth that the social services agency is under a nondiscretionary obligation to conclude that the unborn or infant child is at risk of foster care, and that preventive services are therefore mandated.

■ Once it is accepted that the findings specified in Social Services Law § 409-a (1) (a) involve the exercise of discretion and judgment, it follows that Special Term erred in that part of its order that granted the motion to the intervenors-plaintiffs for a preliminary injunction requiring the city defendants to prepare service plans within 30 days, and thereafter to provide the services recommended in such plans. In issuing this injunction, in effect an order of mandamus, Special Term substituted its judgment for that of the responsible social services officials in matters involving discretion and judgment, and thereby departed from well-established principles governing the granting of mandamus.

As observed in a leading treatise, the principle is well established that "mandamus compels action admitting of no discretion and so clearly required as to be merely ministerial" (Siegel, NY Prac § 577, at 775). This long-standing principle was squarely reaffirmed by the Court of Appeals in *Klostermann v Cuomo* (61 NY2d 525, *supra)*, the authority primarily relied on by plaintiffs on this issue, in terms that leave no room for reasonable disagreement. With regard to mandamus, the Court of Appeals reaffirmed (at 539) that " '[m]andamus lies to compel the performance of a purely ministerial act where there is a clear legal right to the relief sought' *(Matter of Legal Aid Soc. v Scheinman,* 53 NY2d 12, 16). The long-established law is that ' "[w]hile a mandamus is an appropriate remedy to enforce the performance of a ministerial duty,

it is well settled that it will not be awarded to compel an act in respect to which the officer may exercise judgment or discretion" ' ".

Quoting from *People ex rel. Francis v Common Council* (78 NY2d 33, 39), the Court of Appeals reaffirmed in *Klostermann (supra,* at 540): " '[T]he writ of mandamus * * * may also be addressed to subordinate judicial tribunals, to compel them to exercise their functions, but never to require them to decide in a particular manner * * * *A subordinate body can be directed to act, but not how to act, in a manner as to which it has the right to exercise its judgment* * * * Where a subordinate body is vested with power to determine a question of fact, the duty is judicial, and though it can be compelled by mandamus to determine the fact, it cannot be directed to decide in a particular way, however clearly it be made to appear what the decision ought to be.' "

In issuing the preliminary injunction at issue here, Special Term in effect directed the responsible social services officials to exercise their discretion and judgment in a particular way, something which the court was not authorized to do. If, in fact, the intervenors-plaintiffs were denied preventive services to which they were entitled as the result of an erroneous failure by the social services officials to make the statutorily prescribed findings, the appropriate response would be that set forth in a regulation promulgated by the State Department of Social Services in 1983, which explicitly provides for a fair hearing to persons aggrieved by the denial, reduction, or termination of preventive services. *(See,* 18 NYCRR 423.4 *[l]* [4].) If, after requesting and obtaining a fair hearing, an applicant for preventive services receives an unfavorable decision, he has a right to judicial review by means of an article 78 petition (Social Services Law § 22 [9] [b]).

Although the intervenors' complaint is not precise as to the theory underlying their request for system-wide declaratory relief with regard to preventive services, or the exact form that such declaratory relief was to take, it is apparent from plaintiffs' appellate presentation that the application for system-wide declaratory relief with regard to preventive services was based upon the theory that the statute, considered together with the regulations, imposes a nondiscretionary duty on social services officials to make the findings set forth in Social Services Law § 409-a (1)—a construction we have found to be untenable.

The record discloses no other legally viable basis for granting system-wide declaratory relief, nor are we able to find in plaintiffs' presentation any claim that such relief is appropriate on a different theory. To the extent to which it may be concluded on the basis of various studies presented in the record that the defendants have erred in many individual cases in failing to make findings under circumstances in which such findings should have been made, it is clear that system-wide declaratory relief is not available to address claims of individual errors of judgment in separate cases involving different factual situations, none of which (except for the intervenors-plaintiffs) are before us for our consideration, and which have not been shown to involve any single principle equally applicable to any defined group of families.

We note additionally that the record discloses no claim, nor any basis for such claim, that it was the policy of the defendants to refuse to make the statutorily required findings, even where the facts were believed to justify them, in an effort to limit or avoid expenditures. Indeed, given the central reality that the governing statute provides enriched State reimbursement where mandated preventive services are provided, it would seem unlikely that financial considerations have improperly affected individual decisions.

██ Finally, we are unable to agree with Special Term's conclusion that whatever child service plan pursuant to Social Services Law § 409-e "is in effect at a particular time is in the nature of a contract by the city, the performance of which is enforceable by a court * * * [and that] the city has an obligation to deliver whatever available services it proposes at any particular time." (134 Misc 2d, *supra,* at 86-87.) We find no basis in the statute for this construction, which seems to us to misconceive the clear meaning of the relevant statutory sections.

As previously observed, Social Services Law § 409-a (1) (a) requires a social services official to "provide preventive services to a child and his family, in accordance with the child's service plan as required by section four hundred nine-e of this chapter and the social services district's child welfare services plan submitted and approved pursuant to section four hundred nine-d of this chapter". The critical statutory phrase— "in accordance with"—plainly does not mean the same as "all" or "all available services". If the Legislature had intended that "all services" or "all available services", or all

available services appropriate to short-range goals identified in the plan, were required to be delivered, it is not easy to see why language embodying that intent was not used.

Nor is it difficult to discern the reason for the use by the Legislature in Social Services Law § 409-a (1) (a) of the words "in accordance with the child's service plan as required by section four hundred nine-e of this chapter".

The words used were consistent with, and in furtherance of, the fundamental distinction drawn in the statute between mandated preventive services—services provided under Social Services Law § 409-a (1) (a) following the findings that have been discussed at length—and preventive services provided in the absence of such findings under subdivision (2). As we have seen, the statute provided an enriched reimbursement formula for mandated preventive services. The clear reason for the statutory phrase was to make certain that the enhanced reimbursement provided for mandated preventive services would be limited only to such services when the justification for them had been documented in a record that could be reviewed by the New York State Department of Social Services.

The error in Special Term's construction of the statute seems to us further confirmed by Social Services Law § 409-e (3) which directs a review of a child's service plan "in consultation with the child's parent or guardian, where appropriate, at least within the first ninety days following its preparation and at least every six months thereafter." The section goes on to provide: "Such revisions shall indicate the types, dates and sources of services that have actually been provided and an evaluation of the efficacy of such services, and any necessary or desirable revisions in goals or planned services." What unmistakably appears from this subdivision is that it was contemplated by the Legislature that services listed in the plan might not actually be provided within the time intervals for review and revision.

Moreover, we think it likely that Special Term's construction would have consequences that are almost precisely the opposite of those that were intended. Where a child has been identified as being at risk of foster care it surely seems preferable, and in accordance with sound professional practice, that the concerned social services officials identify all services relevant to the existing situation to permit maximum flexibility in responding to quickly changing circumstances

without being apprehensive that every identified service would be required by law to be provided. The almost certain consequence of Special Term's construction, and one that the Legislature surely did not intend, would be to induce social services officials to limit narrowly the services identified in the original child's service plan lest they be obligated to provide services that experience and changing circumstances may indicate to be unnecessary or inappropriate.

The dissenting opinion opens its discussion of the issues that divide the court with the comment that the writer agrees "with much of the majority's opinion, including the finding that the preparation of the child service plan and the provision of mandatory preventive services in accordance with such plan involve the exercise of discretion". In this candid observation the dissenting opinion finds untenable, although the opinion does not so state explicitly, the legal theory on the basis of which the plaintiffs sought, and secured, an order of mandamus requiring as to the intervenor families the preparation of child support plans, and the provision of services identified in such plans, and which is also central to the claim for system-wide declaratory relief with regard to preventive services. Nonetheless, the dissenters would affirm the relevant parts of the order appealed from, justifying this conclusion on the basis of a complex analysis, the different parts of which are not easy to follow or to understand, but which in effect obliterates the distinction between discretionary and ministerial acts that is central to the law of mandamus.

Thus, the dissenting opinion contends that the provision of preventive and protective services "are but discretionary means to the fulfillment of SSC's nondiscretionary duty to protect children who are believed to be suffering from abuse or neglect".

What becomes immediately apparent upon analysis is that this formulation reaches an untenable conclusion on the basis of two fundamental errors. First, as is obvious from an examination of the Child Welfare Reform Act of 1979, preventive services are not authorized for the purpose of protecting abused or maltreated children. Under Social Services Law § 409 preventive services are defined as "supportive and rehabilitative services provided * * * to children and their families for the purpose of: averting an impairment or disruption of a family which will or could result in the placement of a child in foster care". Undoubtedly it will often be the case that abuse or maltreatment of children by a parent will

justify the conclusion that there is danger of the impairment or disruption of a family which could result in the child being placed in foster care, in which event preventive services are authorized, mandated under Social Services Law § 409-a (1) (a) if the statutory findings are made, and discretionary under section 409-a (2) in the absence of such statutory findings. But it is indisputably clear that preventive services are authorized only for the purpose of avoiding the risk of a child being placed in foster care, not for the purpose of safeguarding abused or maltreated children. The safeguarding of abused or maltreated children was clearly intended to be advanced by the protective and rehabilitative services authorized by the Child Protective Services Act of 1973.

As a study of the regulations promulgated by the New York State Department of Social Services makes clear, the preventive services authorized to prevent disruption of families and the placement of children in foster care, and the protective services authorized for the safeguarding of abused and maltreated children, are in many respects the same or quite similar, the principal differences arising from the separate, if related, purposes sought to be achieved under the two statutes.

Assuming, however, that preventive services were to be considered as authorized for the purpose of safeguarding abused or maltreated children, it is clearly wrong for a court to issue an order of mandamus directing a social services official to provide a service which in the exercise of discretion the official found to be unwarranted on the theory that the discretionary service is simply a means to the fulfillment of a nondiscretionary duty. This notion effectively eliminates the distinction between discretionary and ministerial acts. Moreover, it seriously distorts the legal reality to describe as nondiscretionary the duty to protect children believed to be suffering from abuse.

As an examination of the relevant statutory section makes clear, some aspects of the duty of child protective service workers are nondiscretionary, one of which, the duty to commence investigations within 24 hours of receiving a report of child abuse or maltreatment, was an issue specifically raised on this appeal. However, many of the critical decisions made by child protective service workers in discharge of their duties clearly involve the exercise of discretion and judgment. Is there credible evidence supporting the report of child abuse or maltreatment? Do the circumstances require action pending a

determination as to whether the report of abuse is supported by credible evidence, and if so, what action? Assuming that the report is confirmed by credible evidence, should the child be removed from the parent or parents, or should protective and rehabilitative services be provided, and if so, which services? It is by no means always the fact that a confirmation of validity of a report will require that either a child be removed or that protective services be provided. All of these are clearly matters involving the exercise of judgment and discretion, and under established rules courts may not by way of mandamus require a social services worker to take one or another action which that worker has concluded was unjustified in the exercise of discretion and judgment.

Nor does it seem to us helpful to an understanding of the legal issues raised to assert that the "duty to timely investigate all reports, to probe for credible evidence of neglect as legally defined, and to provide whatever services are necessary to safeguard the child during the investigation and thereafter, is not discretionary." Manifestly, child protective services caseworkers have a nondiscretionary duty to timely investigate all reports of abuse or maltreatment.

It seems equally obvious, although the contrary view is central to much of the dissenting opinion, that a claim that in a particular case a worker did not adequately "probe for credible evidence of neglect", and that the worker failed in the exercise of discretion and judgment to provide services alleged to be necessary, does not convert these manifestly discretionary duties into nondiscretionary ministerial acts.

Although an evaluation of the correctness of the determinations of the social services workers with regard to the needs of the plaintiff families for preventive services is not an appropriate issue on this appeal, the comment in the dissenting opinion on that subject requires something to be said as a matter of fairness to those workers and to the larger group of social services workers of whom they may be thought to be representative. What an objective evaluation of the entire record discloses is that in almost all of the cases the judgment of the social services workers that children were not at risk of foster care was clearly correct in light of the facts known to them, and that for the most part the correctness of the determinations was not affected by any facts subsequently developed.

Nor do we think the record justifies the observation that as

a whole the response of the social services workers to the undoubted needs of the family plaintiffs was lacking in competence. Undoubtedly the record discloses what appear to be omissions and lapses. When considered as a whole, the response of the several social services workers to the problems presented was far more substantial than is suggested in the dissenting opinion. As to two of the original plaintiff families, the record establishes that preventive services appropriate to their situations were in fact authorized prior to the commencement of this lawsuit, although the direction for such services had not been put into effect at that time. As to almost all of the family plaintiffs, the record is clear that the parents did not request at any time prior to the commencement of the lawsuit those services, the denial of which was set forth as a ground for relief in this action, and the record does not establish for the most part that the social services workers should have been aware of those needs. In one case, and that one of the two intervening families, the Lee family, the parent emphatically denied in response to inquiries the existence of conditions that might have justified the providing of such services, and on the very day she signed the affidavit claiming a failure to respond to her request for services, denied in response to a specific inquiry by a social services worker that she had any need for services.

In the above observations we of course do not suggest that social services employees are only obligated to provide services where requested. Obviously, they have an obligation to provide services where the need for such services is established to the satisfaction of the social services worker. The fact that families did not request such services, although the denial of requests for such services was alleged in plaintiffs' affidavits, is surely relevant to a fair evaluation of the manner in which the social services workers discharged their obligations.

Nor is it accurate to say that the inquiry into the report of child abuse relating to the Lee family was limited to the inquiry of the mother. The record is clear that the social services worker questioned not only the mother, but also the oldest child in the family and the boyfriend whose alleged conduct was central to the complaint of child abuse. In addition, the social services worker determined on the basis of personal observation and investigation that there was no substance to the claim in the report of abuse that the family was lacking sufficient food or clothing for the children.

What clearly appears is that the central problem of most of

these families was their lack of a permanent home, and although the social services workers are authorized to assist them in securing permanent homes, and in fact did so, it is clear that they had neither the authority nor the ability to provide such homes.

This is not to say that the record does not disclose inadequacies and failures, nor that it does not disclose room for considerable improvement, but it is not fair to this group of workers to present them as uniformly incompetent, callous, or insensitive to their important obligations.

In addition to confirming the order appealed from, our dissenting colleagues have concluded "upon searching the record * * * that appellants have failed to comply with the mandatory directives of Social Services Law §§ 423 and 424 in all cases, due to an erroneous policy promulgated by defendant Commissioner of the New York State Department of Social Services". In particular, it is urged that a regulation promulgated by the New York State Department of Social Services, 18 NYCRR 432.2 (b) (4) (x), impermissibly limits the discretionary power of the social services workers under Social Services Law § 409-a (2) to provide preventive services. On the basis of this analysis, it is urged that a declaratory judgment should be entered striking down that section as arbitrary and invalid, and giving detailed instructions to the several agencies as to how they should discharge their functions.

In this aspect of the dissenting opinion our colleagues raise and determine an issue not presented by the notice of appeal in this case, and grant to plaintiffs, who did not cross-appeal from Special Term's order, relief not requested in the motion that gave rise to that order, on the basis of a theory never presented by plaintiffs.

From a study of the complaint and amended complaint, it is indisputable that these pleadings never identified the regulation in question as arbitrary or invalid, or suggested that the regulation in any way adversely impacted on the plaintiff families or upon other families alleged to have been similarly situated. An examination of the factual submissions introduced by, and on behalf of, the family plaintiffs, discloses no claim that they were deprived of services because of the regulation, nor the suggestion of any factual basis for the conclusion that the regulation in question affected in the slightest degree the services which they received. Indeed, as to two of the plaintiff families who were never the subject of

reports of child abuse, and as to one which was the subject of such reports at times not relevant to the issues in this case, the irrelevancy of the regulation is apparent. As to the three families in which there was such a report, the record is conclusive that the regulation alleged to be invalid in no way affected the response of the social services officials to their needs.

By any standard it would be unusual behavior for an appellate court to reach and determine an issue never presented in a litigation, and to do so without providing an opportunity for the adversely affected parties to be heard on a question which they had no reason to believe was part of the litigation. (See, Collucci v Collucci, 58 NY2d 834, 837.) In this case, the suggested departure from the normal rules governing appellate courts is singularly unwarranted.

This lawsuit is obviously the highly professional result of a cooperative effort involving lawyers of outstanding ability, respected advocates for the homeless, and the trained personnel of major organizations with large and extensive experience in addressing the problems of abused and maltreated children and their families. It is not easy to believe that in their extensive experience with such children and their families the skilled personnel of the organizational plaintiffs would not have observed, if it were the fact, that the families had been deprived of needed services because of an invalid regulation, and that the lives of children had been put in jeopardy, if not in fact lost, as a result of that regulation. Nor is it easy to believe that if any of the several studies of the response of government agencies to the problems of abused children had disclosed the pernicious effect of the regulation discovered on this appeal by our dissenting colleagues, a challenge to the regulation would not have been part of this lawsuit.

The reason that the regulation was not part of the case presented by plaintiffs' skilled counsel is readily apparent from an examination of the regulation together with the entire body of regulations and the statutes that the regulations were intended to implement.

The regulation is one of a group which sets forth the responsibilities and powers of the child protective service. That service is vested with the sole responsibility for receiving and investigating reports of child abuse, and is the sole entity responsible for providing and coordinating services necessary to safeguard the child's well-being and to preserve and stabi-

lize family life when appropriate. The particular regulation in issue was concerned with defining the circumstances under which child protective service caseworkers, exclusively authorized and empowered to provide protective and rehabilitative services to children who were the subject of reports of abuse or maltreatment, should also be permitted to provide preventive services of the kind normally furnished by other social services workers for the purpose of preventing family disruption. The regulation states that child protective workers should be permitted to provide preventive services only where the family was eligible for mandated services and where the protective service caseworker was directly providing other services to the subjects of indicated abuse and/or maltreatment reports. As the dissenting opinion acknowledges, nothing in this section diminished, or purported to diminish, in any way the existing discretionary power of other social services workers to provide preventive services.

Manifestly, the regulation which our colleagues would strike down as arbitrary, in the absence of any presentation on the issue by the parties before us, is concerned with the allocation of functions between social services workers authorized in the normal course of their duties to provide preventive services and child protective caseworkers who have the sole responsibility for investigating reports of child abuse and maltreatment, and the sole responsibility for providing a broad plenitude of protective and rehabilitative services in the discharge of their duties. The central thesis of this aspect of the dissenting opinion is that, in ways not easy to understand and for which no shred of support exists in this record, the limitation on the power of child protective caseworkers to provide nonmandated preventive services in some way impairs significantly their ability to discharge their functions.

We are told that this limitation on the power of child protective services caseworkers to provide preventive services, although they have broad power to provide rehabilitative and protective services, in part duplicative of preventive services and in some respects probably more extensive, somehow impedes their ability "to gather evidence 'swiftly and competently' ". In the absence of any support in this record that any of the plaintiff families were adversely impacted by this limitation, and in the absence of any suggestion in the extensive literature on the subject that this limitation has the consequences attributed to it, the sweeping conclusion drawn by our colleagues rests on a very tenuous foundation indeed.

What is presented is a professional disagreement between our colleagues and the New York State Department of Social Services as to the proper allocation of functions under the statutes with which we are concerned, between social services workers authorized in the course of their duties to provide preventive services and child protective caseworkers. In a lawsuit that fairly presented the issue, in which the facts provided some color of support for the conclusion reached by the dissenters, and in which the New York State Department of Social Services had an opportunity to respond, the issue of the reasonableness of the regulation might well be appropriate for judicial consideration. That issue has no appropriate place in this lawsuit.

In reaching the above-described legal conclusions, we do not intend to suggest that all is well with the provision of preventive services. The record includes studies by qualified professionals—studies for the most part sponsored and authorized by one or more of the defendant agencies—in which it was found that there have been severe deficiencies by the several defendants in discharging their statutory obligations to provide preventive services.

In particular, it has been found that the city defendants have frequently failed to provide two important core preventive services in circumstances in which such services were indicated—homemaker services and day-care services. In addition, it has been found that many children, notwithstanding the statute with which we are concerned, have been placed in foster care where, in the opinion of those conducting the studies, preventive services might have avoided that result.

Assuming the essential correctness of the conclusions reached in the several studies, and that the conditions described in them have not significantly changed since the studies were conducted, it would seem clear that a radical improvement in the response of the several defendants to their obligations to provide needed preventive services is a matter of large and urgent public importance.

Accordingly, the order of the Supreme Court, New York County (Edward H. Lehner, J.), entered August 7, 1986, which granted defendants' motion to renew and thereupon adhered to the court's original order dated May 27, 1986, which, *inter alia,* (1) granted the motion of intervenors-plaintiffs for a preliminary injunction requiring the city defendants to prepare service plans within 30 days, and thereafter to provide

all services recommended therein; (2) granted the motion of the organizational plaintiffs for a preliminary injunction requiring the city defendants to commence investigations of reports of suspected child abuse or neglect within 24 hours of receipt of such reports; and (3) denied the city defendants' motion for summary judgment should be modified, on the law, without costs, to deny the motion of intervenors-plaintiffs for a preliminary injunction requiring the city defendants to prepare service plans within 30 days and to provide all services recommended in such plans; to declare that the findings set forth in Social Services Law § 409-a (1) (a) involve the exercise of discretion and judgment; to declare that a child's service plan prepared in accordance with Social Services Law § 409-e does not constitute a contract enforceable as such by the court; and to dismiss as otherwise nonjusticiable plaintiffs' claim for system-wide declaratory relief with regard to preventive services, and otherwise affirmed.

ROSENBERGER, J. (dissenting). "Every five or six days a child dies in New York City because of parental abuse or neglect. Some die because they have been left alone. Some are the victims of a parent's psychotic delusions. Some have had illnesses which have been neglected. Some are killed while in the hands of incompetent baby sitters. Some starve to death. Some die because of safety hazards which should have been corrected. Some are beaten to death."

This is the grim reality faced by far too many children living today in the City of New York according to the Report of the Public Child Fatality Review Committee headed by former Family Court Judge Nanette Dembitz (the Committee). This expert Committee was appointed in January 1985 by defendant-appellant Commissioner of the New York City Department of Social Services to study and to provide an outside appraisal of the performance of the city's Department of Social Services (DSS) and, particularly, of Special Services for Children (SSC), the agency responsible for child protective services and preventive services for children and their families in New York City. The Committee reviewed 89 cases in which children had died of suspected parental abuse or neglect during 1985, for the purpose of "detecting any systematic deficiencies in SSC as well as other agencies involved in childcare." The Committee's findings were published in a report dated December 23, 1986, a little more than one year after this action was instituted. Although the report of the Commit-

tee is not part of the record herein, I take judicial notice of its findings which are directly relevant to the issues raised by the original plaintiffs-respondents and by plaintiffs-intervenors-respondents.[1]

This action, brought by a number of mothers with young children who find themselves homeless and destitute, and by several not-for-profit organizations providing services and assistance to children and the homeless, places before this court the record of SSC's performance in carrying out its statutory duties under Social Services Law, article 6, title 4, Preventive Services for Children and Their Families (§ 409 *et seq.,* the Child Welfare Reform Act of 1979) and article 6, title 6, Child Protective Services (§ 411 *et seq.,* the Child Protective Services Act of 1973).

The common thread running through the allegations of the individual respondents is that they are in need of services to prevent their children from being placed in foster care, but that SSC has failed or refused to provide preventive services to them as mandated by the Social Services Law and the regulations thereunder. The organizational respondents allege that in a substantial number of cases, SSC has failed to commence investigations of abuse or neglect reports within 24 hours, as required by law, leaving over 6,000 children at risk. They further allege that even when investigations are timely commenced, SSC fails to offer appropriate services to the children and their families during the investigation, also as required; fails to provide any real protection to the children; and fails to carry out "even the most rudimentary elements of the 90 day child protection investigation." These failures, according to respondents, violate New York State Social Services Law and Federal laws under which defendants-appellants are reimbursed for foster care and child welfare programs (Social Security Act tits IV-E [42 USC § 670 *et seq.],* IV-B [42 USC § 620 *et seq.]).*

While I agree with much of the majority's opinion, including the finding that the preparation of the child service plan and the provision of mandatory preventive services in accor-

---

1. The findings of the Committee were publicly acknowledged and accepted by defendant-appellant, Commissioner of Social Services, whose Internal Fatality Review Panel had reached similar conclusions in its study of 35 of the 1985 abuse- or neglect-related deaths and of 42 such deaths which occurred in 1986, all of them in families previously known to SSC. *(See,* mem of Jan. 29, 1987, from William J. Grinker to Stanley Brezenoff, re: Activities of the HRA Internal Fatality Review Panel.)

dance with such plan involve the exercise of discretion, I nevertheless conclude, following an analysis of the Social Services Law and the regulations promulgated thereunder, that these acts are but discretionary means to the fulfillment of SSC's nondiscretionary duty to protect children who are believed to be suffering from abuse or neglect and to provide whatever services are necessary to safeguard such children. While I would affirm the grant of injunctive relief to respondents, I reach that result by a different route from the one taken by the court below and, consequently, I would frame the order differently. I do not agree with the finding below that the 409-e service plan is in the nature of a contract, and I consider this finding unnecessary to the decision to award respondents the declaratory and injunctive relief sought. I find the clear, mandatory directives of the Social Services Law sufficient to warrant such relief.

The Social Services Law establishes a process, which the court may compel appellants to implement and to follow, in order to effectuate the important statutory aims of the Child Welfare Reform Act and the Child Protective Services Act— which are: to protect children who are suffering from abuse or neglect; to safeguard their health and well-being, either in the home or while in foster care; and to make appropriate, reasonable efforts to rehabilitate the family so that the children may remain safely in the home or be returned to it as soon as possible.

The fact that the social services officials must make discretionary determinations at various stages of the child protective investigation and in formulating a rehabilitative plan for the family does not mean that they have the discretion to make no determination; to ignore the statutory process intended to bring information to their attention which would require them to act as directed by law *(People ex rel. Francis v Common Council,* 78 NY 33 [1879], cited with approval in *Klostermann v Cuomo,* 61 NY2d 525, 539-540 [1984]). What the majority fails to perceive is the interrelation of the mandatory investigatory process established under the Child Protective Services Act and the discretionary findings preliminary to a determination that preventive services are mandated.

The protective services investigation is intended to reveal information about the family which will enable social services officials to determine whether a child is at risk of foster placement and whether there are services which will eliminate that risk. Indeed, the protective service investigation is

the sole means available to SSC for establishing what are the conditions in the home and whether there are legal grounds for removing the child to foster care.

If the protective service fails to conduct competent investigations into all reports of suspected abuse or neglect, as required by law, then there will inevitably be children left in homes where their health and well-being are endangered, without any services to protect them or to rehabilitate the family—in other words, without services which are mandated by law. Without thorough, competent investigations by the protective service, there is simply no empirical basis for any of the discretionary decisions SSC is called upon to make in exercising its statutory mandate.

In their motion for summary judgment below and in their briefs on appeal, appellants claim that they have complied with the relevant law and regulations, on a system-wide basis and in their dealings with the individual respondents; that the complaint is unfounded and should be dismissed. The affidavit in support of the motion from the Deputy Administrator in charge of SSC sets forth appellants' analysis of the statutory and regulatory framework for the protective and preventive services. The supporting affidavits of SSC's Director of Court Services detail the steps taken by the social services officials in response to the problems of the original parties plaintiff and the intervenors.

In reviewing the case records for the intervenor families, I find that they fully support the conclusion that the children in the Williams family were at risk of foster placement. As to the Lee family, the record raises questions about the adequacy of the protective service investigation on which SSC based its determination that the report of suspected neglect was unfounded. Moreover, upon searching the record and reviewing the law, I find that appellants have failed to comply with the mandatory directives of Social Services Law §§ 423 and 424 in all cases, due to an erroneous policy promulgated by defendant Commissioner of the New York State Department of Social Services who is not a party to this appeal.

The State defendants have taken the position that the grant of injunctive relief against the State would be inappropriate because it has neither the statutory nor regulatory authority to perform the duties delegated to the local child protective and preventive services. However, defendant Commissioner promulgates the regulations which guide these local services

in the performance of their duties and which govern the reimbursement of funds to the local agencies (Social Services Law §§ 409-b, 427). Inasmuch as these regulations impede the local protective service in carrying out its statutory duties, the additional relief specified herein is both necessary and proper. Therefore, I conclude that respondents are also entitled to certain declaratory and injunctive relief not specifically sought below, as specified herein.

The majority takes strong exception both to the reasoning underlying my conclusion that additional relief is warranted and to the propriety of deciding an issue which, it is said, was not specifically addressed by the parties either below or on appeal. I must, however, respectfully disagree with my colleagues on both of these points. As noted above, appellants argued their interpretation of the Social Services Law and the regulations at length, in seeking summary judgment and in their motion for reargument below. They also cited the particular regulation which I find to be contrary to certain statutory provisions, although appellants did not refer to the offending clause (x) (18 NYCRR 432.2 [b] [4] [x]). It should also be noted that respondents argued, in opposition to appellants' motion below, that there was a bona fide legal issue as to whether the individual respondents were entitled to receive mandated services and that "a definitive interpretation of the law is needed to move defendants to provide these services." The lower court, without explicitly addressing appellants' analysis of the law, denied their motion and, in effect, granted summary judgment to respondents. Appellants now challenge that ruling.

We are, therefore, called upon to determine, as a matter of law, what are appellants' duties under the Social Services Law and whether they have acted in accordance with their statutory mandate. In order to do so, we must review all aspects of the relevant law, not merely those portions cited by the parties. After such review, should it appear "that any party other than the moving party is entitled to a summary judgment" then this court, as a division of the Supreme Court, "may grant such judgment without the necessity of a cross-motion" (CPLR 3212 [b]) or a cross appeal (*Merritt Hill Vineyards v Windy Hgts. Vineyard,* 61 NY2d 106, 110-111 [1984]).

Appellants maintain that respondents' cases were thoroughly and promptly investigated before this action was commenced and that the investigations revealed no need for, nor any statutory entitlement to the requested preventive ser-

vices. Nevertheless, preventive services were provided to the individual respondents after they instituted this action. These individuals then withdrew as parties plaintiff. However, two other families, Lee and Williams, who are similarly situated, were granted leave to intervene. Despite the fact that SSC has only recently determined that the children in these families were not at risk of foster placement, and therefore that preventive services were not mandated, preventive services were likewise provided to the intervenor families after they moved to join this action.

The allegations in the affidavits of the individual respondents substantially conflict with the version of events presented in the affidavits of SSC's Director of Court Services. Even if SSC's recitation is fully credited, the picture presented of appellants' response to these cases does little to reassure that they are performing competently. SSC claims that no social services official has ever suggested, nor has any determination been made, that the Williams children are at risk of foster placement. Contrary to the conclusion reached by the majority, I find that the facts which the social services officials knew or should have known regarding this family so plainly indicated imminent danger to the children's health and well-being and, therefore, a risk of foster placement, that SSC's assertion amounts to a declaration that, in this case at least, appellants have inadequately performed their statutory duties.

The Williams family became homeless in September 1985, after Mrs. Williams, who had been deserted by her husband, was forced to leave her sister's small apartment. Mrs. Williams, who was then several months pregnant, and her five children slept in a hallway for several days. In October 1985, the family was sent by the Emergency Assistance Unit to the Roberto Clemente Shelter in The Bronx, a barracks which accommodates several hundred people in a single room. The shelter, however, immediately rejected the family because the youngest child had tuberculosis. Thereafter, the family was provided with temporary emergency housing in the Martinique Hotel,[2] where they occupy one room. Mrs. Williams

---

2. Among the findings of the Dembitz Committee was the conclusion that families which are temporarily housed in welfare hotels have special needs because "[a]dded to poverty is the disruption of whatever network of support and resources the family had in its old neighborhood" (Report of the Committee, at 74). Seven of the children whose deaths were investigated

states that the room is usually cold and her son with tuberculosis "coughs a lot and feels sick because of the cold."

The Crisis Intervention Service (CIS) caseworker who prepared the Williams family intake record on October 23, 1985, noted that the youngest child was taking medication for his tuberculosis, the eldest son was also taking a prescription drug for asthma, and Mrs. Williams was taking antibiotics for a kidney infection. However, the CIS caseworker who interviewed the family on October 30, in the Martinique Hotel, indicated on their "Family Service Assessment" form that there were "no" members of the Williams family under medical care. He also left the form blank where it calls for a description of "any health problems family members have, including * * * any medication prescribed". Not surprisingly, the caseworker concluded that the family did not fit any of the criteria for a health service referral.

In January 1986, Mrs. Williams failed to keep an appointment with her social worker and her whereabouts were unknown until four days later when the social worker contacted Mrs. Williams' sister who said that the children had been left with her. On January 17, Mrs. Williams had had herself admitted to Bellevue Hospital, as a psychiatric emergency patient, because she feared she would hurt either herself or the children. After she was released from the hospital, her sister informed her that she would not again agree to take the children and they would have to go to foster care next time.[3]

On February 18, while taking the subway with her five children from the Martinique Hotel to the Emergency Assistance Unit in Brooklyn, Mrs. Williams went into labor and had to be taken, by ambulance, to the hospital. Her sixth child

lived in welfare hotels. The Committee pointedly recommended the replacement of "welfare hotels" with decent housing for the growing number of New York's homeless families with children. Although it is acknowledged that this was a long-term solution, the Committee advocated that while the welfare hotels exist, "preventive and protective services must be supplied to meet the special dangers to children who live there."

3. It is not surprising that SSC found no report from Bellevue Hospital in its files, indicating that the Williams children might be at risk of abuse or neglect. The Dembitz Committee found that the law requiring hospitals to report suspected abuse or neglect was "an insufficient safeguard" because the mental health professionals are not always aware of the child's existence. (Report of the Committee, at 45-46.) What is surprising, however, is that the DSS social workers, who knew that the mother of these five children had reached the limits of her ability to cope, saw no danger to the children.

was born on February 19 with an infection which kept him in the hospital for the first week of his life. He died 40 days later in the Martinique Hotel.

This record indicates several critical failings, not only of the social services worker who neglected to obtain vital health information, but of the DSS case management. It raises serious questions about appellants' performance: was there a comprehensive file kept on the Williams family; was it ever systematically reviewed; if so, why did no one make a report to the protective service regarding the obvious risk to the health of these children? For, it is evident that if people in the Roberto Clemente Shelter were in danger of contracting tuberculosis from the Williams boy, his four siblings, sharing one room with him in the Martinique Hotel, were also in danger.

All social services workers have a statutory duty to report suspected cases of abuse or neglect (Social Services Law § 413), and are expected to be alert to situations which pose an imminent danger to the health and well-being of children. As discussed, *infra,* it is the report of suspected abuse or neglect which prompts the child protective service to investigate and to make a determination which, ultimately, enables SSC to say whether or not the child is at risk of foster placement, and whether there are services which would eliminate that risk— i.e., mandated preventive services. Thus, the failure, *ab initio,* of DSS social workers to report a case of suspected neglect may lead to the failure to provide preventive services which are mandated by law.

In the case of the Lee family, a report was made to the protective service alleging that the Lee children were not properly fed or clothed because Mrs. Lee was giving her public assistance money to her boyfriend. While the protective service worker made contact with the family within 24 hours, as required, the "investigation" consisted of nothing more than an interview with Mrs. Lee who denied the allegations.

It should be emphasized that it is the children, not the parents, who are the intended beneficiaries of the Child Protective Services Act and the Child Welfare Reform Act. In many instances, particularly where the investigation may uncover evidence of criminal conduct by the parents, the parents' interests may be adverse to those of the child. Consequently, SSC's reliance solely on parental denials of the allegations must be seen as a failing. The Dembitz Committee also criticized the "excessive reliance" by caseworkers on their

own impressions of a parent as "concerned" about the child. (Report of the Committee, at 28.) The Committee urged that SSC improve supervision to help its workers "understand the limits of their knowledge about the families, and the need to assess cases on an ongoing basis. Assessment can rarely be completed in one meeting." (Report of the Committee, at 29.)

After the Lee family intervened in this action and SSC agreed to provide services to them, it was discovered that the younger children had not been attending school because they lacked proper immunizations and had other health-related problems. Ongoing contacts with the family revealed conflict between Mrs. Lee and her teen-age daughter who was picked up by the police in Pennsylvania Station with bruises on her face from where her mother had punched her. This problem was resolved by the daughter being sent to live with relatives in the south. The family was eventually given referrals for health services, day-care and housing assistance.

Mrs. Williams, Mrs. Lee and the organizational respondents herein claim that they are entitled to system-wide declaratory and injunctive relief. There can be no doubt as to the irreparable harm which respondents will suffer if the agencies charged with providing protective and preventive services neglect their statutory duties. However, before the court may exercise its formidable equity powers, "no matter how emotionally compelling" the claims may be, respondents are required to show a likelihood of success on the merits *(Tucker v Toia,* 54 AD2d 322, 326 [4th Dept 1976]). The remedy they seek, in the nature of mandamus, depends on the character of the duty which respondents would have the court compel appellants to perform *(Klostermann v Cuomo,* 61 NY2d 525, 539-540, *supra).* The character of that duty is to be found through examination of the Social Services Law.

## Child Protective Services and Nonmandated Preventive Services

It is the very strong public policy of this State indeed, "the state's first obligation" to children in destitute families—to help the family "with services to prevent its break-up or to reunite it" (Social Services Law § 384-b [1] [a] [iii]; § 131 [3]; *see, Matter of Star A.,* 55 NY2d 560, 566 [1982] [Meyer, J., dissenting]). Yet, this policy must be carefully balanced against the State's duty, as *parens patriae,* to safeguard the health and well-being of children. *(See, Finlay v Finlay,* 240

NY 429, 433-434 [1925] [Cardozo, J.]; *see also, Santosky v Kramer,* 455 US 745, 766-767 [1982].) Article 6 of the Social Services Law, and titles 4 and 6 of that article in particular, establish the complex regulatory scheme through which the State attempts to effect this social policy while, at the same time, fulfilling its moral duty as sovereign.

One aim of Social Services Law, article 6, title 6, is to encourage reporting and investigation of suspected child abuse and maltreatment by establishing, in each county, "a child protective service capable of investigating such reports swiftly and competently" (Social Services Law § 411). The local protective service must also be capable of providing protection for the child or children "from further abuse or maltreatment and rehabilitative services for the child or children and parents involved" (§ 411). To this end, every local child protective service must maintain "a sufficient staff of sufficient qualifications to fulfill the purposes of this title" (Social Services Law § 423 [1]). Adequate numbers of competent staff are essential to the fulfillment of the child protective service's statutory duty because the local child protective service is "the sole public agency" responsible for receiving and investigating, or arranging for the investigation of, "all reports" of suspected child abuse or maltreatment (§ 423 [1]).

The Social Services Law sets out a specific time frame and particularized requirements for the investigation of reports of abuse or maltreatment (Social Services Law § 424). A State-wide central register was created under title 6 to receive reports of suspected abuse or maltreatment from persons under a statutory duty to report such cases *(see,* Social Services Law § 413) and from other persons making such reports, either openly or anonymously.

It is necessary to emphasize the critical role of those under a statutory duty to report suspected cases of abuse or neglect. Without such reports the statutory mechanisms for protecting children and rehabilitating their families remain idle and ineffective. The willful failure to make a report by persons legally required to do so is a class A misdemeanor and may give rise to civil liability as well (Social Services Law § 420). As noted above, all social services workers are required to report cases "when they have reasonable cause to suspect that a child coming before them in their professional or official capacity is an abused or maltreated child" (Social Services Law § 413).

After initial screening, the central register relays the reports to the local child protective service for investigation (Social Services Law § 422). Upon receipt of such a report, the child protective service must commence an appropriate investigation "within twenty-four hours" (Social Services Law § 424 [6]). The protective service investigation must include "an evaluation of the environment of the child named in the report and any other children in the same home" and a determination of the risk to the children if they remain in the existing home environment. (§ 424 [6]). If an initial assessment indicates that this environment presents an imminent danger to the life or health of the child or children, the child protective service caseworker may remove them from the home, in accordance with the provisions of the Family Court Act (§ 424 [8]; see, Family Ct Act § 1024).

Seven days after receiving the report of suspected abuse or maltreatment, the local child protective service must forward a preliminary written report of its initial investigation to the State central register. The preliminary report must include an evaluation of the home environment and a summary of actions taken or contemplated. (Social Services Law § 424 [3].) Thereafter, follow-up reports must be sent periodically to the central register until a final determination is made.

The caseworker must also assess "the nature, extent and cause of any condition enumerated" in the report of suspected abuse or maltreatment (Social Services Law § 424 [6]) and the service has 90 days within which to determine whether the report is unfounded or "indicated"—i.e., that "some credible evidence of the alleged abuse or maltreatment exists" (Social Services Law § 424 [7]; § 412 [5], [6]). A protective service investigation is not complete unless these distinct statutory requirements have been met.

While the determination that a report is indicated or unfounded is a matter of discretion, the law requires that the investigation on which that determination is based be conducted "swiftly and competently." The court below found, and I agree, that appellants have not commenced timely investigations in all cases, as required. I further find that appellants have not conducted competent investigations in all cases due to an erroneous policy promulgated by defendant Commissioner of the New York State Department of Social Services.

The adequacy of the protective service investigation must be judged in light of the statutory functions it serves. First and

foremost, the protective service is the *sole* public agency authorized to instigate or to conduct an investigation into the home for purposes of establishing "when the state, through its family court, may intervene against the wishes of a parent on behalf of a child so that his needs are properly met." (Family Ct Act §§ 1011, 1034; Social Services Law § 424 [11].) The investigation commenced under Social Services Law § 424 provides grounds for initiation of child protective proceedings under the Family Court Act, the only legal avenue for removing the child to foster care. At a minimum, therefore, this investigation must determine whether there is credible evidence, sufficient to warrant judicial intervention by the Family Court—i.e., prima facie evidence of abuse or maltreatment, as legally defined.

The definitions of abuse and maltreatment in Social Services Law § 412 incorporate by reference the definitions of abuse and neglect found in section 1012 of the Family Court Act. The definition of neglect is of special concern given the facts presented herein and because, according to one expert, it "has been the predominant type of report (58% of reported cases in 1984) and deprivation of necessities has been the major form of maltreatment identified (55% of maltreated children in 1984) over the history of reporting statistics." (McCabe, Child Neglect: A Research View, in Child Abuse and Neglect, at 23 [Cohen, McCabe and Weiss editors, 1986].)[4] Maltreatment subsumes the category of neglect which is defined as follows in Family Court Act § 1012:

"(f) 'Neglected child' means a child less than 18 years of age

"(i) whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired *as a result of the failure of his parent* or other person legally responsible for his care *to exercise a minimum degree of care*

"(A) in supplying the child with adequate food, clothing, shelter or education * * * or medical * * * care, *though financially able* to do so *or offered financial or other reasonable means to do so*". (Emphasis supplied.)

Under this definition, the fact that the child or children are at risk because of material privation is not, of itself, sufficient to support a finding of neglect. Where the parent is financially unable to make adequate food, clothing, shelter, or medical

---

4. Dr. Maryann McCabe was the Director of the Child Sexual Abuse Project for the New York State Department of Social Services until 1986.

care available, reasonable means for providing these necessities must be offered to the parent.

The determination of whether a report of child neglect is unfounded or indicated must turn on an assessment of the indigent parent's intent and competence in providing the necessities of life to the child once the parent has been given reasonable assistance. Evaluation of parental competence in meeting the child's needs is essential because, however well intentioned the parent may be, good intentions are not enough to insure a child's well-being (*Matter of Franz*, 55 AD2d 424, 426-427 [2d Dept 1977]). Indeed, the purpose of the protective service investigation is to differentiate those cases where an otherwise competent parent is simply overwhelmed by circumstances outside of his or her control—such as being homeless in the midst of New York City's housing crisis—from those cases where the parent is irremediably incompetent.

Where, based on the investigation into the home environment, "any child [is] *believed to be suffering* from abuse or maltreatment" the child protective service must pursue the investigation by offering the parent reasonable means to resolve the problem (Social Services Law § 424 [9]; emphasis supplied).[5] Undoubtedly, there may be instances where the degree of danger posed to the child definitively bespeaks a lack of parental competence, thereby obviating the need to probe any further (Family Ct Act § 1046 [a] [ii]; *see, Matter of Shelley Renea K.,* 79 AD2d 1073 [3d Dept 1981]). However, it is equally certain that in many, if not most, cases the cause of the parental failure will be ambiguous. The offer of reasonable means to eliminate the danger to the child is, therefore, essential to the investigation into suspected neglect. Without it, the protective investigation must be deemed inadequate because it has failed to seek evidence which would establish each of the necessary elements of neglect, as legally defined.

The investigation by the child protective service is not complete once reasonable means have been offered and ac-

---

5. Should the parent refuse the reasonable means offered to alleviate the child's distress, that refusal is evidence of neglect and the child protective service may seek a Family Court order to compel the parent to accept the services offered. (Social Services Law § 424 [10]; 18 NYCRR 432.2 [b] [4] [iv]; *see,* Family Ct Act §§ 1027, 1054.) If the parent persists in neglecting the child's needs despite diligent efforts by the social service agencies to help the parent provide for the child, the Family Court may ultimately terminate his or her parental rights (Family Ct Act § 1031; Social Services Law § 384-b; *see also, Matter of Star Leslie W.,* 63 NY2d 136, 142-143 [1984]).

cepted. The service must monitor the parent's performance to determine whether those means are effective in eliminating the danger to the child, or merely in palliating it. For, in addition to investigating reports of suspected child abuse or maltreatment, the child protective service also has a duty *"to prevent* further abuses or maltreatment to children *and to coordinate, provide or arrange for and monitor the provision of those services necessary to safeguard and ensure the child's well-being"* (Social Services Law § 423 [emphasis supplied]).

If the child would again be imperiled by withdrawal of the services or assistance given the parent during the investigation, then the protective service must continue to provide them until such time as they may be withdrawn without endangering the child. Services which are necessary to safeguard the children in the home and without which the children would be at risk of foster placement are mandated under section 409-a (1) and must be provided in accordance with the child service plan, required under section 409-e of the Social Services Law. *(See,* discussion, *infra.)*

I cannot agree with the majority's assertion that a child who has been the subject of an indicated abuse or neglect report (one in which credible evidence of abuse or neglect is present) may be left in the home with no protective or preventive services to prevent a recurrence of the abuse or neglect. This would clearly be contrary to the directive of Social Services Law § 423. Moreover, I question SSC's ability to determine that an indicated report of abuse or neglect is merely an isolated incident unless the protective service monitors the parent's performance for some period after the report is deemed indicated and provides services to prevent a recurrence. *(See,* 18 NYCRR 432.2 [b] [5].)

The majority raises the objection that preventive services are intended, not to protect children in the home, but to rehabilitate the family. It is perfectly clear, however, that if the child is to live safely at home with parents who have abused or neglected him, then the parents must be rehabilitated. This is the protective service's mandate and section 411 requires that it be capable of providing "rehabilitative services for the child or children and parents involved" in the report. The error of the majority's assertion is evident from the regulations: *"Rehabilitative service* means those services necessary to safeguard and insure the child's well-being and development and to preserve and stabilize family life, including but not limited to preventive services as defined by Part

423 of this Title, and protective services for children" (18 NYCRR 432.1 [i], formerly 432.1 [h] [original emphasis]). Indeed, the only function performed by the protective service which is not considered a "rehabilitative service", under this regulation, is the investigation and evaluation of abuse or maltreatment reports.

The distinction between protective and preventive services appears, upon first reading of the regulations, to be more nominal than real. Protective services "shall mean services on behalf of children" who are named "in an alleged or indicated report of abuse and/or maltreatment" (18 NYCRR 432.1 [p], formerly 432.1 [o]). The regulation goes on to list 14 activities which "may be considered protective services for children" and one of these is: "arranging for the provision of *appropriate rehabilitative services, including but not limited to preventive services* and foster care for children" (18 NYCRR 432.1 [p] [9] [emphasis supplied]). Thus, preventive services would appear to be merely a subset of the "rehabilitative services" which the protective service may offer.

The regulation which defines preventive services (18 NYCRR 423.2 [b]) lists 15 activities in this category. Among the 15 preventive services, 6 are deemed "core services" which must be provided to families entitled to receive mandated preventive services, if their child service plan indicates the need for them. These "core services" are: day-care services; homemaker services; parent aide and parent training services; clinical services; transportation; and 24-hour emergency services (18 NYCRR 423.2 [b], [d]). It is these core services which respondents allege are being denied to them and to others similarly situated, on a system-wide basis.[6]

Although preventive services are mandated under circumstances set forth in subdivision (1) of Social Services Law § 409-a, under subdivision (2) of this section *nonmandated preventive services* may be provided to a child or his family for

---

6. Respondents have submitted a report titled "Foster Care 1984," on the implementation of the recommendations from the Mayor's Task Force on Foster Care. *(See,* affidavit of Sister Mary Paul in support of the motion for a preliminary injunction.) This report is quite critical of appellants' performance in delivering preventive services and it supports respondents' claim that very few families receive the most needed supportive preventive services. The report states: "Unfortunately, as a result of State law and regulations and City Policy, the vast majority of funds from the Child Welfare Reform Act are used for counseling and case planning rather than to provide concrete assistance such as shelter, homemakers, day care, or emergency cash grants."

the purpose of "averting an impairment or disruption of a family which *will or could* result in the placement of a child in foster care" *(see,* Social Services Law § 409 [emphasis supplied]; *see also,* Social Services Law § 424 [12]). Thus, the Social Services Law plainly authorizes provision of whatever services, protective or preventive, are necessary to avert the possibility of foster placement. Moreover, the law allows these services to be administered at whatever stage of the protective service investigation the caseworker first identifies conditions which, if left uncorrected, might disrupt or impair the family unit.

The regulations promulgated by defendant Commissioner of the New York State Department of Social Services, however, bar the protective service caseworker from offering nonmandated preventive services at any stage of the protective investigation prior to the ultimate determination that the report is indicated. Consequently, the caseworker cannot offer day-care, homemaker,[7] or parent training services as an investigatory tool to determine whether a report of suspected neglect is indicated, even when such services are the only reasonable means for assessing the parent's competence in meeting the child's needs.

Although regulation 432.2 (b) (4) (ii) contains a general authorization to provide or arrange for "services to children named in child abuse and/or maltreatment reports and their families *prior to a determination*" as to whether the report is indicated (18 NYCRR 432.2 [b] [4] [ii] [emphasis supplied]), regulation 432.2 (b) (4) (x) specifically bars the offer of preventive services before such a determination has been made. Under that regulation, the child protective service caseworker may provide preventive services in addition to protective services only "as long as the case is eligible for *mandated preventive services*" under 18 NYCRR 430.9 *and* the caseworker is directly providing services "to the children named

7. The majority asserts that the protective service is authorized, during the investigation, to provide day-care and homemaker services which, under regulation 432.1 (p) (10), "may be considered protective services" but which, under regulation 423.2 (b), are defined as preventive services. However, a close reading of regulation 432.1 (p) (10) does not support this. "Programmatic need for [these] service[s] must have been established as a result of the investigation" into a report of abuse or maltreatment and these services must terminate when the case is closed with the central register "pursuant to the standards set forth" for closing indicated cases (18 NYCRR 432.1 [p] [10]; 432.2 [c]; *cf.,* 18 NYCRR 432.9, governing disposition of unfounded reports).

*in indicated abuse and/or maltreatment reports* and their families" (18 NYCRR 432.2 [b] [4] [x] [emphasis supplied]; *see also,* 18 NYCRR 423.4 [i]).

Thus, upon further examination of the regulations, it becomes clear that "preventive services" are rehabilitative services which may only be provided after a determination that an abuse or maltreatment report is indicated. The majority contends that the rehabilitative services which the child protective service may provide are "in part duplicative of preventive services and in some respects probably more extensive". Therefore, the majority reasons, the above-cited restriction does not preclude the protective service from providing the same type of services (although not called preventive services) during a continuing investigation.

The problem, however, is that if the protective service did so, SSC would forfeit its right to reimbursement. Under section 409-b, 50% of the allowable costs for nonmandated preventive services are reimbursable by the State *(see,* 18 NYCRR 423.5). Even the majority must concede that it is unreasonable to penalize SSC by denying it reimbursement for services which it has a duty to provide and which it is authorized to provide, under subdivision (2) of section 409-a, and for which it is entitled to reimbursement.

The majority's argument that this regulation does not restrain other social services officials from offering families nonmandated preventive services prior to a determination that they are eligible for mandated services also misses the point. As discussed, *infra,* there must be an imminent risk that the child will be placed or continued in foster care, and a determination that preventive services will eliminate that risk, before the family is eligible for mandated preventive services under section 409-a (1), or for nonmandated services under regulation 423.3 (b). *(But cf.,* Social Services Law § 409-a [2].) However, a finding that the child is at risk of foster placement presupposes that an abuse or neglect report has been found indicated.[8]

---

8. The imminent risk of foster placement arises only when legal grounds for removing the child from the home, pursuant to article 10 of the Family Court Act, are found to exist. An article 10 petition must allege "facts sufficient to establish that a child is an abused or neglected child under this article" or, that the return of the child to his parent's custody "would place the child in imminent danger of becoming an abused or neglected child." (Family Ct Act § 1031 [a], [d].) Unless there is evidence of abuse or neglect, the child cannot be removed from the home. The strong, constitutionally

A request for preventive services, either directly from a destitute parent or through a referral by DSS or a private agency, must, therefore, be denied unless credible evidence has been found that a child in the home is abused or mal-treated. It is completely unrealistic to expect that the parent will provide such evidence or that it will, by chance, be revealed without methodical investigation. Unless a report has been made and the protective service finds credible evidence of abuse or neglect, as legally defined, there is no basis for finding that the child is at risk of foster placement and, therefore, no basis for providing either mandated or nonman-dated preventive services.

The majority acknowledges that the protective service is vested with sole responsibility for investigating reports of suspected neglect and for determining when a neglect report is indicated. The foregoing analysis has shown that credible evidence of neglect, as legally defined, is evidence that the parent has failed to adequately provide for the child even though offered reasonable means to do so. The offer of means which might reasonably be expected to eliminate the danger to the child is an indispensable part of the investigation into the reported neglect. Without it there is no evidence of paren-tal fault.

If the protective service investigation fails to uncover such evidence where it exists, no other social services official is authorized to seek it out or to make a determination that the report of suspected neglect is indicated and, therefore, that the child may be removed from the home. Thus, the offer of nonmandated preventive services *by the protective service* caseworker is an essential option, authorized under the stat-ute but barred under regulation 432.2 (b) (4) (x), for conducting competent investigations into all cases of suspected neglect.

This regulation directly conflicts not only with protective service's statutory duty to investigate, but also with its duty to arrange for and monitor the provision of "those services necessary to safeguard and insure the child's well-being" (18 NYCRR 432.1 [i]) during the 90-day investigatory period. While regulation 432.2 (b) (4) (v) accurately reflects the protec-tive service workers' duty to insure, during the investigation, that "the treatment plan protects the child from further

protected interest of parents in retaining custody of their children requires a showing of parental fault or unfitness before the State may interfere in the parent-child relationship. *(Stanley v Illinois,* 405 US 645, 649-657 [1972].)

abuse or maltreatment", and that the family "is receiving the kind and degree of treatment services it needs" clause (x) of this regulation eliminates preventive services as an option for the treatment plan, even when such services may be necessary to protect the child and to determine whether the child can remain safely in the home if such services are provided. In essence, regulation 432.2 (b) (4) (x), which makes no distinction between mandated and nonmandated preventive services, makes Social Services Law § 409-a (2) a dead letter.

While an administrative agency's construction and interpretation of the statute under which it functions is entitled to "greatest weight" *(Matter of Herzog v Joy,* 74 AD2d 372, 375 [1st Dept 1980], *affd* 53 NY2d 821 [1981]), where such interpretation is erroneous, as a matter of law, it cannot stand. Regulation 432.2 (b) (4) (x) is an impermissible obstacle to fulfillment of the protective service's statutory duties. The option of providing nonmandated preventive services is fundamental to the statutory scheme for detecting cases of neglect, and to the performance of the protective service's duty to provide "those services necessary to safeguard and insure the child's well-being".

Consequently, respondents are entitled, as a matter of law, to a declaration that regulation 432.2 (b) (4) (x) is contrary to the provisions of the Social Services Law and impermissibly impedes the protective service agencies from carrying out their duties thereunder. Defendant Commissioner of the New York State Department of Social Services should be required on remand: to recall regulation 432.2 (b) (4) (x) and to promulgate a new regulation consistent with the provisions of Social Services Law § 409-a (2) and the duties incumbent on the child protective services under sections 423 and 424 of said law; and to review all regulations promulgated under Social Services Law, article 6, titles 4 and 6, to insure that they are consistent with said law; and to redraft any regulations found to be inconsistent or incompatible therewith.

## Mandated Preventive Services

Upon a finding by a social services official "that [a] child will be placed or continued in foster care" unless preventive services are provided "and that it is reasonable to believe that by providing such services the child will be able to remain with or be returned to his family", the provision of said preventive services, in accordance with the child's service plan, is then mandated by law (Social Services Law § 409-a [1]

[a]). Thus, preventive services are mandated once a two-part finding has been made: (1) that the risk of foster placement or continued foster care is imminent; and (2) that preventive services will be effective in eliminating that risk.

Evidence of neglect, as that term is legally defined, is evidence of parental failure to provide for the child once reasonable means to do so have been offered. As noted above, when dealing with destitute families it will be impossible to determine, in most cases, whether the condition endangering the child is a sign of temporary stress caused, for example, by the family being homeless, or a symptom of deep-seated parental failure. The offer of nonmandated preventive services by the protective service as an exploratory mechanism is essential for determining whether the danger to the child can be eliminated or alleviated if the destitute parent receives assistance. Without it, there is simply no basis, in many cases, on which to make a competent finding as to the need for, or the imminence of, foster placement.

The failure to detect evidence of neglect thus leads to a failure to identify the child or children as being at risk of placement in foster care. That determination, in turn, is what triggers the requirement that SSC prepare a child service plan in accordance with section 409-e. In drafting the child service plan, SSC is required to make a detailed assessment "of the child and his family circumstances" and "of the likelihood that specific preventive services" will improve conditions in the home sufficiently to avert, or reduce the duration of, foster placement (§ 409-e [1] [b]). The provision of nonmandated preventive services during the protective service investigation provides an empirical basis for determining which services, if any, will enable the neglected child to remain safely in the home or be returned to it sooner. Without empirical evidence that services will be efficacious, the 409-e child service plan will be based on mere supposition.

However, as has already been shown, regulation 432.2 (b) (4) (x), promulgated by defendant Commissioner of the New York State Department of Social Services, improperly forbids the child protective service from offering nonmandated preventive services during the investigation as a means of detecting neglect, as legally defined. Without such evidence of parental incompetence there is no legal risk of the child being removed from the home. Inasmuch as the protective service is "the sole public agency" charged with investigating reports of suspected child abuse and neglect, its failure to gather evidence "swiftly

and competently" means that children who would otherwise be identified as being at risk of foster placement are left in a dangerous home environment without services to improve the conditions which have escaped detection—often with tragic consequences.

This regulation, promulgated in derogation of the provisions of section 409-a (2), directly and adversely affects the administration of mandatory preventive services under section 409-a (1). Indeed, it negates the possibility, in many cases, of the required finding under section 409-a (1) being made by preventing the evidence on which such a finding must be based from ever being gathered.

Appellants contend, and the majority agrees, that respondents are not entitled to the relief that they seek because they never requested mandated preventive services. First, it must be borne in mind that abused and maltreated children are the intended beneficiaries of these services, not their parents. Indeed, the parents' interest may directly conflict with those of the child, in which case a request for services may never be made. Second, and more importantly, the law imposes a clear and compelling duty on SSC to investigate and uncover those cases in which children are endangered in the home and in which preventive services are needed to make the home safe for them. To hold that respondents were required to request preventive services, is to impose a duty where the law creates none and to relieve SSC of the duty incumbent upon it to provide preventive services where investigation reveals they are required, whether or not a request has been made.

Were it not for the State's policy prohibiting protective service agencies from offering nonmandated preventive services when those services are appropriate and necessary for detecting evidence of neglect, families which are entitled to mandated preventive services would be identified and helped far more often than is now the case.

The existence of this policy is clear and convincing evidence that appellants have failed to carry out their statutory duties to conduct and supervise competent child protective service investigations into all cases of suspected neglect; to gather evidence on which to base a finding under Social Services Law § 409-a (1); and to provide mandated preventive services where required by law. Therefore, an injunction directing appellants to perform their statutory duties appears both necessary and appropriate (*Klostermann v Cuomo, supra,* at 531).

While it is true, as the majority points out, that the findings required pursuant to section 409-a (1) are discretionary, the Social Services Law imposes a nondiscretionary duty on the protective service agency to investigate all cases of suspected abuse or maltreatment "swiftly and competently" and a duty to provide those services necessary to safeguard children from abuse or neglect in the home. Thus, while it would be inappropriate for the court to compel the performance of a purely discretionary act, "[w]hat must be distinguished, however, are those acts the exercise of which is discretionary from those acts which are mandatory but are executed through means that are discretionary." *(Klostermann v Cuomo, supra,* at 539.)

Appellants emphasize the elements of discretion inherent in the determinations preliminary to the mandatory provision of preventive services. However, appellants' duty to timely investigate all reports, to probe for credible evidence of neglect as legally defined, and to provide whatever services are necessary to safeguard the child during the investigation and thereafter, is not discretionary. Each of these nondiscretionary functions is intended to yield information which will enable appellants to determine whether the risk of foster placement exists due to parental neglect and what services, if any, will eliminate that risk by making the home safe for the child.

The Social Services Law vests in appellants various discretionary means for conducting investigations into suspected cases of abuse and neglect, and for protecting children during the 90-day investigatory period and thereafter. Where recourse to those discretionary means is essential to the fulfillment of appellants' statutory duties, then an injunction will issue "to compel acts that officials are duty-bound to perform, regardless of whether they may exercise their discretion in doing so" *(supra,* at 540).

It follows from this analysis of the law that respondents are entitled to an injunction requiring appellants to insure: that all social services workers comply with their statutory duty to report cases in which there is reasonable cause to believe that a child coming before them in their professional capacity is an abused or maltreated child; that the protective service commence investigations into all reports of suspected abuse or maltreatment within 24 hours and complete such investigations within 90 days; that, whenever any child is believed to be suffering from neglect based on the initial protective service evaluation or any subsequent analysis of the home envi-

ronment, the protective service shall coordinate, provide or arrange for and monitor the provision of appropriate services to the family, including nonmandated preventive services, as a means of determining whether there is credible evidence of neglect, as legally defined, unless it is determined that there are no such services which might reasonably alleviate or eliminate the condition endangering the child, in which case the child or children shall be taken into protective custody pursuant to the provisions of the Family Court Act; and that, whenever it appears, during the protective investigation, that the continuation of said services is necessary to safeguard the child or children in the home or to make the children's safe return to the home possible, then such services are to be provided as mandated preventive services, in accordance with the child service plan drafted under Social Services Law § 409-e.

It is clear that the administrators and social service workers are hard-working people of good faith and that the regulations are complicated and, perhaps, confusing. Despite this, it is to be remembered that the task at hand is the rehabilitation of families, the protection of the health and welfare of children and ultimately, the saving of their lives.

SULLIVAN and WALLACH, JJ., concur with SANDLER, J. P.; KASSAL and ROSENBERGER, JJ., dissent in an opinion by ROSENBERGER, J.

Order, Supreme Court, New York County, entered on or about August 7, 1986, modified, on the law, without costs and without disbursements, to deny the motion of intervenors-plaintiffs for a preliminary injunction requiring the city defendants to prepare service plans within 30 days and to provide all services recommended in such plans; to declare that the findings set forth in Social Services Law § 409-a (1) (a) involve the exercise of discretion and judgment; to declare that a child's service plan prepared in accordance with Social Services Law § 409-e does not constitute a contract enforceable as such by the court; and to dismiss as otherwise nonjusticiable plaintiffs' claim for system-wide declaratory relief with regard to preventive services, and otherwise affirmed. The appeal from the order of the same court entered on or about May 27, 1986 is unanimously dismissed as superseded by the appeal from the order entered on or about August 7, 1986.