Matter of Mental Hygiene Legal Serv. v Daniels (2017 NY Slip Op 08645)





Matter of Mental Hygiene Legal Serv. v Daniels


2017 NY Slip Op 08645


Decided on December 12, 2017


Appellate Division, First Department


Renwick, J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on December 12, 2017
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

David Friedman,J.P.
Dianne T. Renwick
Richard T. Andrias
Karla Moskowitz
Ellen Gesmer, JJ.


251095/16 4429 

[*1]In re Mental Hygiene Legal Service, Petitioner-Respondent,
v
Anita Daniels, etc., Respondent-Appellant.



Respondent appeals from the order of the Supreme Court, Bronx County (Ben R. Barbato, J.), entered December 16, 2016, which denied its cross motion to dismiss the proceeding, and granted the petition to the extent of declaring that respondent's failure to provide petitioner with a complete copy of a patient's so-called medical chart in any proceeding pursuant to MHL 9.31(a) violates Mental Hygiene Law (MHL) 9.31(b) when read together with MHL 9.01, MHL 33.16(1), and 14 NYCRR 501.2(a), and ordering respondent, in any action brought pursuant to MHL 9.31(a), to provide petitioner with a complete copy of such medical chart prior to any MHL 9.31(b) hearing.



Eric T. Schneiderman, Attorney General, New York (Andrew Rhys Davies, Anisha S. Dasgupta and Bethany A. Davis Noll of counsel), for appellant.
Marvin Bernstein, Mental Hygiene Legal Service, New York (Sadie Zea Ishee and Maura Klugman of counsel), for respondent.



RENWICK, J.


This article 78 petition was commenced by the Mental Hygiene Legal Service (MHLS), "the oldest legal advocacy program for the institutionalized mentally disabled in the United States" (History of MHLS - New York State Unified Court System, https:www.nycourts.gov/courts/ad2/pdf/mhlsart10/MHLS_history.pdf [accessed June 28, 2017]). Originally named the Mental Health Information Service, the agency's name was changed to MHLS in l986 to more accurately reflect its duties and functions (id.). Since its creation by statute in 1964, MHLS has served as the watchdog of the rights of the institutionalized mentally disabled in New York and has been recognized by the courts as essential to the state's statutorily "protective shield of checks and balances" governing the admission, transfer and retention of [*2]psychiatric patients (see Fhagen v Miller, 29 NY2d 348, 355 [1972], cert denied, 409 US 845 [1972] [internal quotation marks omitted]).
In this article 78 proceeding, MHLS seeks to compel respondent Anita Daniels, in her official capacity as Acting Director of Bronx Psychiatric Center (BPC), to comply with Mental Hygiene Law (MHL) 9.31(b)[FN1]. MHLS contends that the clear language of the foregoing statute requires that BPC, in a special proceeding pursuant MHL 9.33 to retain a patient in a hospital for involuntary psychiatric care, must provide MHLS a copy of a patient's record, as defined by MHL 9.01, 14 NYCRR 501.2(a), and MHL 33.16(1). Respondent failed to provide a complete copy of the aforementioned record prior to each and every one of the retention hearings. Accordingly, MHLS avers that respondent has failed to perform a duty imposed by law. BPC opposes this petition and cross-moves for its dismissal. Specifically, BPC contends that because MHLS has not suffered injury by the alleged conduct, MHLS lacks standing to bring this proceeding and dismissal therefore is warranted pursuant to CPLR 3211(a)(3). Alternatively, on the merits, BPC contends that the petition must be denied because MHL 9.31(b) does not require the broad disclosure alleged by MHLS.
MHL 9.27 authorizes a hospital to admit a patient involuntarily if three physicians, including a psychiatrist, confirm that the patient is "mentally ill and in need of involuntary care and treatment" (MHL 9.27[a]; see MHL 9.27[e]). A person is "in need of involuntary care and treatment" if the patient "has a mental illness for which care and treatment . . . in a hospital is essential to such person's welfare and whose judgment is so impaired" that the person "is unable to understand the need for such care and treatment" (MHL 9.01). A "mental illness" is defined as "an affliction with a mental disease or mental condition which is manifested by a disorder or disturbance in behavior, feeling, thinking, or judgment to such an extent that the person afflicted requires care, treatment and rehabilitation" (MHL 1.03[20]).
In order to retain a patient involuntarily for more than 60 days, the hospital must obtain a court order so directing, although the patient may remain hospitalized while the application for such an order is pending (MHL 9.33[a]). The hospital must show "that the patient is mentally ill and in need of continued, supervised care and treatment, and that the patient poses a substantial threat of physical harm to himself and/or others" (Matter of Anonymous v Carmichael, 284 AD2d 182, 184 [1st Dept 2001] [internal quotation marks omitted]). On the other hand, MHLS has a duty "[t]o provide legal services and assistance to patients or residents and their families related to the admission, retention, and care and treatment of such persons" (MHL 47.03[c]; see MHL 47.01[a]). MHLS further has a duty "[t]o initiate and take any legal action deemed necessary to safeguard the right of any patient or resident to protection from abuse or mistreatment" (MHL 47.03[e]).
MHLS brought this article 78 proceeding in August 2016, seeking a writ of mandamus declaring that BPC had failed to perform its duty pursuant to MHL 9.31(b) and ordering BPC to comply therewith. The petition alleges that BPC's "pattern and practice" in MHL 9.31 retention hearings is "to provide MHLS and the court with . . . inter alia, the admission, transfer or retention application papers and orders, but not the patient's complete clinical record, as defined in MHL 33.03, 33.13, and 33.16," which is "colloquially referred to as the medical chart'." An average medical chart consists of one or two binders containing hundreds of pages of documents, and is continually updated with any new documents related to the patient's treatment. Instead, according to the petition, "BPC's practice is to offer the original medical chart into evidence as an exhibit at each . . . retention hearing," without offering any copies to MHLS, and returning the [*3]original chart to the hospital ward after the hearing pursuant to MHL 33.13.
Beginning in early 2016, MHLS "began to notice" that the documents in the medical charts introduced by BPC at retention hearings "had been added or removed just prior to the hearing, thwarting [MHLS's] ability to determine with any certainty what the chart contained." The petition further explained that no copies of those exhibits were provided to MHLS or to the court. Accordingly, in March 2016, an MHLS attorney advised BPC's counsel by email that MHL 9.31 requires BPC "to provide [MHLS] with a copy of the full record of the patient prior to any court proceeding," and MHLS "began requesting copies of patients' medical charts in individual cases."
In an email response on April 12, 2016, BPC's Director of Medical and Legal Affairs, Dr. Makeda Jones-Jacques, simply stated that "there is no problem with MHLS making copies of whatever you need," tacitly denying MHLS's claim that BPC is required to provide a current copy of the chart to MHLS at every retention hearing.
BPC cross-moved to dismiss the proceeding on the grounds that petitioner lacks standing, and that the writ of mandamus does not lie because MHLS does not have a clear legal right to the relief sought. BPC emphasized that MHLS always has full access to medical charts, 24 hours a day, seven days a week, pursuant to MHL 47.03(d).
Supreme Court, by a decision and order dated December 16, 2016, denied BPC's motion to dismiss and granted MHLS's petition for relief. Initially, on the threshold issue of standing, Supreme Court agreed with BPC that MHLS lacked "individual standing." Supreme Court, however, found that MHLS did possess "organizational standing" to maintain the action based on MHLS's statutory mandate. Specifically, the court noted that MHL 9.31 (b) and its disclosure mandate is patently intended to protect the rights of patients in proceedings pursuant to MHL 9.31(a) by ensuring that they are provided with the very records which generally form the basis of any application under MHL 9.31(a). This petition, the court noted "of course, is an extension of that duty." The court further concluded that "the patients who [MHLS] represents — many of who are alleged to be afflicted by psychiatric injuries — have not and will not initiate a proceeding such as this one to compel [BPC] to comply with MHL 9.31(b)."
On the merits of the petition, Supreme Court held that "in failing to provide [MHLS] with a complete copy of a patient's medical chart in any proceeding pursuant to MHL 9.31(a), [BPC] is violating the clear language and legislative intent of MHL 9.31(b), which . . . requires that [BPC] provide copies of the entire chart not just portions thereof prior to the hearing." The court further held that "the petition establishes that the duty imposed by MHL § 9.31(b) is compulsory rather than discretionary and mandates the action — disclosure — sought by [MHLS]." The court concluded that it was "clear that [BFC] has and continues to refuse to abide by the clear unequivocal mandate of the foregoing statute." Supreme Court accordingly ordered that BPC provide MHLS with a complete copy of each respective patient's medical chart prior to any MHL 9.31 retention hearing. BPC appealed and, as an agency of the State, invoked its right to an automatic stay of the underlying decision pending the outcome of this appeal.
We must first address the threshold question of whether MHLS has standing to maintain this action. Under the two-part test for determining standing, a plaintiff or petitioner must first show "injury in fact," meaning that the plaintiff or petitioner will actually be harmed (in a way distinct from the harm to the general public) by the challenged administrative action; next, a plaintiff or petitioner must show that the asserted injury arguably falls within the "zone of interests" or concerns sought to be promoted or protected by the statutory provision (see New York State Assn. of Nurse Anesthetists v Novello, 2 NY3d 207, 211 [2004]). An organizational plaintiff or petitioner must show a harmful effect on at least one of its members such that the member would have standing to sue, that the interests it asserts are germane to its organizational purposes to satisfy the court that it is an appropriate representative of those interests, and that the [*4]case would not require the participation of individual members (id.; Rudder v Pataki, 93 NY2d 273 [1999]).
This Court has found organizational standing under exceptional circumstances involving organizations that were dedicated to protecting a class of individuals who suffered injuries which certain statutes were intended to guard against, and who could not otherwise act in their own interests. For example, in Grant v Cuomo (130 AD2d 154 [1st Dept 1987], affd 73 NY2d 820 [1988]), this Court held that organizations concerned with the care and protection of children possess standing to litigate the claim that government social services agencies violated their statutory obligations to provide children protective and preventive services by failing to respond to allegations of child abuse within a 24-hour period, notwithstanding the fact that the organizations only asserted, in general terms, an injury based on the added burden to their resources. This Court found that denying standing would be to exempt from judicial review the government's failure to comply with their statutory obligations. This Court further noted the societal concern with the protection of children, the historic relationship of these organizations to the goals sought by the relevant statutes, the fact that the abused children are not able to seek a judicial remedy, and that the parents or caretakers, the objects of the claims of abuse or maltreatment, would be unlikely to secure a remedy (130 AD2d at 159).
Similarly, in Mixon v Grinker (157 AD2d 423 [1st Dept 1990]), this Court found that the Coalition for the Homeless had standing to sue the City on its own behalf, as well as on behalf of the individuals it represented who were unable to seek a judicial remedy on their own, for its failure to provide medically appropriate housing to individuals with HIV. This Court found that the organization had alleged a specific burden on its resources resulting from the provision of non congregate housing and medical assistance to HIV-infected homeless people caused by the City's failure to provide appropriate housing. This Court noted that the majority of desperately ill homeless individuals cannot, owing to illness, poverty, myriad AIDS-related problems and unfamiliarity with their legal rights and the legal process, seek relief on their own behalf (157 AD2d at 427; see also Community Serv. Socy. v Cuomo, 167 AD2d 168, 170 [1st Dept 1990] [standing found for organizations whose members the applicable statute was created to help or who are necessary to insure its effective functioning, and where denial of standing could possibly leave unprotected that part of society most in need of the representation and protection the organizations are able to provide]).
We find that this case involves, as in Grant v Cuomo and Mixon v Grinker, exceptional circumstances that warrant a finding of standing. To begin, the injury that MHLS asserts falls within the interests or concerns sought to be provided or protected by the statutory provision that it invokes. Indeed, BFC does not deny that MHL 9.31(a), which MHLS claims entitled its clients to copies of their entire medical records prior to retention hearings, is intended to protect the rights of the patients. Concomitantly, MHLS exists to provide legal assistance to patients of psychiatric centers (MHL 47.01[a]) and has a duty to "initiate and take any legal action deemed necessary to safeguard the right of any patient or resident to protection from abuse or mistreatment" (MHL 47.03[e]). Since BPC's refusal is pervasive and affects each and every one of MHLS's clients and their respective retention hearings, we find that MHLS has alleged a specific and genuine burden on its resources. Under the circumstances, we reject BPC's contention that the patient's rights can be effectively protected in the context of individual retention hearings and post-judgment remedies, such as appeals (cf. New York County Lawyers' Assn. v State of New York, 294 AD2d 69 [1st Dept 2002] [clients are not able to protect their own rights to receive effective assistance from attorneys overburdened with excessive caseloads]).
Having found standing, we turn to MHLS's claim that BPC has violated its statutory obligation. We find that MHLS has demonstrated a clear legal right to mandamus relief (Matter of Brusco v Braun, 84 NY2d 674, 679 [1994]). MHL 9.31(b) requires that, upon receipt of a [*5]patient's request for a retention hearing under MHL 9.31(a), it shall be the duty of a director of a facility to give a copy of the record of the patient to MHLS. Under MHL 9.01, a record of a patient "shall consist of admission, transfer or retention papers and orders, and accompanying data required by this article and by the regulations of the commissioner." In turn, the regulations of the Office of Mental Hygiene provide, in relevant part, that "case record, clinical record, medical record, or patient record means clinical record as such term is defined in section 33.16 of the Mental Hygiene Law, whether created or maintained in writing or electronically" (14 NYCRR 501.2 [emphasis added]). The term clinical record is defined under section 33.16 of the Mental Hygiene Law as "any information concerning or relating to the examination or treatment of an identifiable patient or client maintained or possessed by a facility which has treated or is treating such patient or client" (MHL 33.16[a][1] [emphasis added]). Accordingly, we agree with Supreme Court that when read together, these statutory duty and regulatory provisions impose upon BPC a compulsory duty to provide MHLS with a copy of its clients' complete medical charts before their respective retention hearings under MHL 9.31 and 9.33 are held.
In so holding, this Court is mindful, contrary to the dissent's suggestions, of BPC's justifiable concerns of diverting from its limited resources to provide MHLS with copies of its clients' complete medical charts before any of its clients' retention hearings under MHL 9.31 and 9.33. Nevertheless, we cannot turn a blind eye to the clear legislative mandate that each and every one of the individuals, whom MHLS represents and whom are subject to involuntary retention, receive the representation that the legislature has mandated they receive. Ultimately, as a matter of due process,[FN2] the detriment that these patients may experience in not having copies [*6]of their charts available at their hearings is of a plainly higher and more compelling nature than the detriment to the hospital in having to undertake additional photocopying responsibilities (see Addington v Texas, 441 US 418, 427 [1979] [in a psychiatric civil commitment hearing, "(t)he individual should not be asked to share equally with society the risk of error when the possible injury to the individual is significantly greater than any possible harm to the state"]).
The dissent's position is not persuasive. The dissent argues that neither 14 NYCRR 501.2(a) nor the MHL should be used to derive the definition of "accompanying data" within the meaning of MHL 9.01. According to the dissent, while MHL 9.01 does define a client's "records" to mean his or her "accompanying data," it defers to the Office of Mental Health (OMH) regulations to provide, if any, the meaning of "accompanying data" within the context of retention hearings. Carried to its logical conclusion, the dissent would have us interpret the statute to give the Department of Hygiene the absolute discretion to obviate the statute's requirement to provide a patient with "accompanying data" at a retention hearing. The dissent asserts that this interpretation should be reached because OMH fails to promulgate any regulation that defines "accompanying data" within the context of retention hearings.
This approach, however, is inconsistent with the purpose of Mental Health Law 33.16, which requires BPC to provide an indigent patient with his or her medical records upon request. MHL section 33.16 governs access to, and disclosure of, clinical records held by mental health facilities and is very similar to Public Health Law 18, the general statute, which governs access to other patient information. Specifically, as pertinent here, MHL 33.16 not only defines the term "clinical record," but it also requires a mental health facility to provide a patient with the opportunity, when he or she desires, to inspect his or her clinical records. Mental health facilities also have a general obligation to furnish copies of any clinical record that a patient is authorized to inspect, "within a reasonable time" of a patient's request (MHL 33.16[b][5]). While a facility may place reasonable limitations on the time, place, and frequency of any inspection of clinical records and may not charge more than 75¢ per page for copying, a facility may not deny a patient access to copies solely because of the patient's inability to pay (MHL 33.16[b][6]). Finally, since the right to access and to copies are subject to the same limitations (see MHL 33.16[c] [not applicable here]), the Second Department has held that where a medical health facility finds no reason to deny a patient access to his/her clinical record, the denial of the patient's request for [*7]copies of those same records would be arbitrary and capricious (Matter of Billups v Rizzo, 228 AD2d 587, 588 [2d Dept 1996]).
The dissent finds nothing significant about the fact that MHL 33.16 requires respondent to furnish an indigent patient with a copy of his or her records within a reasonable time of a patient's request. Instead, the dissent takes the narrow view that this appeal presents the "humdrum issue" of MHLS's rights rather than the patient's rights, and that "petitioner here is not an indigent patient seeking a copy of his or her chart, but MHLS, a state agency with its own budget and employees." What the dissent ignores is that MHLS's duties and the patient's rights are inextricably interwoven. Indeed, the dissent cannot  and does not — argue that MHLS's actions here are not made pursuant to and consistent with its duties prescribed by MHL to initiate and take any legal action deemed necessary to safeguard the rights of patients who are the subject of involuntary retention. These patients with mental disabilities are not only the most vulnerable members of our society, but they too are entitled to constitutional and statutory protections.
In light of the parameters of MHL 33.16, to accept the dissent's position — that OMH has total discretion to obviate the need to provide a patient with the "accompanying data" required to be made available at the retention hearing - is to conclude the incongruous: that while indigent patients who are treated by mental health facilities generally have the right to access and to copies of their clinical records, they surrender such rights when the mental health facility seeks to retain the patient for involuntary psychiatric care. To do so would be to ignore the clear mandates of MHL 33.16. The courts are not free to ignore a clear mandate of the legislature.
The dissent's position that BPC will be unduly burdened and its resources wasted by compliance with MHL by providing a copy of a patient's medical records prior to a retention hearing is based on the mere opinion of an assistant attorney general with 10 years of experience in representing BPC in these matters. Of equally, and arguably greater, import is the position of the MHLS attorney with 30 years of experience in these matters. The MHLS attorney explained to the court below that MHLS's requests are not "hollow" demands, but intended to help assure that the medical testimony adduced against its clients at the retention hearings is accurate, which can only be accomplished by the review of the medical record prior to the proceeding. The dissent's argument that such duties could easily be accomplished by MHLS lawyer's ability to personally inspect the medical records at the health facility misses the reality of the situation. With an unlimited case load and a limited staff of lawyers, MHLS can ill-afford to spend the extra time and effort required to review and copy records at mental health facilities. Nor does MHLS have the required support staff to help accomplish that task, as the experienced MHLS attorney explained to the court below.
Moreover, contrary to the dissent's conclusion, MHLS's endeavor — to ensure that medical testimony adduced against its client at the retention hearing is accurate — is not rendered wasteful by the fact many of the retention proceedings do not reach the hearing stage. Indeed, as the dissent is fully aware, MHLS's legal duties and responsibilities are triggered immediately upon MHLS receiving notice of BPC's intention to involuntarily retain its clients, and MHLS cannot not safely predict the eventual outcome of each proceeding at its inception.
Significantly, the dissent also ignores the representation made to the court below by the experienced MHLS attorney that MHLS has made similar demands to other mental health facilities, like Bronx Lebanon Hospital and North Central Bronx Hospital, which have begun to comply with MHLS's demand that a copy of a patient's medical record be provided to MHLS prior to a retention hearing. Of course, this undermines the dissent's central conclusion that compliance with the request in each retention proceeding would be unduly "burdensome, wasteful and virtually unworkable" to BPC.
Finally, we reject the dissent's conclusion, that, because MHLS has "around-the-clock access to patient records, the copying is not required for its attorneys to review the charts before [*8]the hearings" and therefore MHLS' clients' due process rights are not implicated. It is abundantly clear that the medical charts at issue here are a fluid set of documents that the medical staff of the pertinent medical facility are constantly updating during the continuing constant treatment and care of the patient. Thus, MHLS attorneys' right to access the charts, "at any given time," would not assure the attorney that he or she was looking at the very same documents BPC relies on at the retention hearing. Under the circumstances, this is not a funding issue, and MHLS's "round-the-clock access to patient records" is not the panacea that the dissent describes.
Accordingly, the order of the Supreme Court, Bronx County (Ben R. Barbato, J.), entered December 16, 2016, which denied BPC's cross motion to dismiss the proceeding, and granted the petition to the extent of declaring that BPC's failure to provide MHLS with a complete copy of a patient's so-called medical chart in any proceeding pursuant to MHL 9.31(a) violates MHL 9.31(b) when read together with MHL 9.01, MHL 33.16(1), and 14 NYCRR 501.2(a), and ordering BPC, in any action brought pursuant to MHL 9.31(a), to provide MHLS with a complete copy of such medical chart prior to any MHL 9.31(b) hearing, should be affirmed, without costs.
All concur except Friedman, J.P. and Andrias, J. who dissent in an Opinion by Friedman, J.P.




FRIEDMAN, J.P. (dissenting)


Mental Hygiene Law § 9.31(b) provides, in pertinent part, that, in advance of a hearing to determine whether a psychiatric hospital may retain an involuntarily admitted patient, "[a] copy of . . . [the] notice [of the hearing] and record shall also be given [by the hospital] to the mental hygiene legal service" (emphasis added)[FN3]. At issue in this article 78 proceeding, brought by petitioner Mental Hygiene Legal Service (MHLS), the agency charged with representing patients in retention hearings, is whether this provision requires respondent, the acting director of Bronx Psychiatric Center (BPC), in advance of a retention hearing, to provide to MHLS, at BPC's expense, a physical copy of a patient's entire medical chart [FN4]. Because MHLS has not, in my view, carried its burden, as a party seeking relief in the nature of mandamus, to "establish[] a clear legal right" (Matter of Council of City of N.Y. v Bloomberg, 6 NY3d 380, 388 [2006] [internal quotation marks omitted]) to be provided with complete copies of patient charts at BPC's expense, I would reverse the order under review, deny the petition and
dismiss the proceeding. Accordingly, I respectfully dissent from the majority's contrary disposition of this appeal.[FN5]
Initially — and contrary to the manner in which the majority portrays the case — it is important to note that this dispute is not about MHLS's access to the complete medical charts of the patients it represents, or its ability to make copies for itself of such charts. Pursuant to Mental Health Law § 47.03(d), MHLS is entitled to access to patient charts "at any and all times," and MHLS — which has offices at BPC — admits that it has always had such around-[*9]the-clock access to patient charts, as well as the ability to make copies, for itself, of any and all portions of a patient's chart. Thus, the majority's concern that not requiring BPC to copy patient charts for MHLS might somehow deprive patients of "due process," or of "the representation that the legislature has mandated they receive," is unfounded [FN6]. Further, contrary to the majority's suggestion that a patient might "not hav[e] copies of their charts available at their hearings," it is undisputed that BPC brings the entire original chart to each hearing and enters it into evidence.
Unable to find any support for its conclusion that (in spite of MHLS's own access and ability to make copies) BPC must use its own limited resources to provide MHLS with a complete physical copy of a patient's chart, the majority mistakenly relies on the definition of "clinical record" in Mental Hygiene Law § 33.16. This statute, however, addresses only the access of patients themselves (not MHLS) to their charts, and permits BPC to charge patients able to pay up to 75¢ per page for paper copies (see § 33.16[b][6])[FN7]. As discussed below, the definition of the term "record" for purposes of article 9 of the Mental Hygiene Law (entitled "Hospitalization of the Mentally Ill," in which section 9.31 appears) does not refer to the definition of "clinical record" in section 33.16 (part of article 33). Neither has the commissioner of the Office of Mental Health (OMH) issued any regulation applying the broad definition of the [*10]term "clinical record" in section 33.16 to the term "record" as used in article 9 of the Mental Hygiene Law.
In short, as demonstrated below, the majority simply cannot point to any provision of either the Mental Hygiene Law or of the regulations issued thereunder that provides authority for construing section 9.31(b) to require BPC to provide MHLS, at BPC's expense, with a physical paper copy of a patient's entire medical chart in advance of a retention hearing. According to the record, the typical chart comprises one or two binders containing hundreds of pages — often double-sided — of progress notes, medication notes, doctor's notes, and the like. Given that these charts are often lengthy and generally grow longer on a daily basis, and in view of the fact that MHLS already has around-the-clock access to these charts and the ability to make for itself copies of any portions it needs, we should defer to the more limited interpretation given by the commissioner of OMH, in the exercise of administrative discretion, to the term "record" as used in article 9 of the Mental Hygiene Law.
As previously noted, subsection (b) of Mental Health Law § 9.31 ("Involuntary admission on medical certification; patient's right to a hearing") provides, in pertinent part, that "[a] copy of . . . [the patient's] record shall . . . be given [MHLS]" by a mental health facility in advance of a retention hearing (emphasis added). Mental Hygiene Law § 9.01 ("Definitions") provides, in pertinent part: "As used in this article: . . . record' of a patient shall consist of admission, transfer or retention papers and orders, and accompanying data required by this article and by the regulations of the commissioner" (emphasis added).
As just noted, the relevant operative language of section 9.01's definition of "record" is "accompanying data required by this article and by the regulations of the commissioner." It is undisputed that BPC has been complying with its obligation to provide MHLS with copies of "admission, transfer or retention papers and orders" in advance of retention hearings. In this proceeding, we are advised that the commissioner of OMH interprets the "accompanying data" to comprise the medical certificates providing the basis for the patient's admission and requests for transfer or retention, copies of which, it is undisputed, BPC has always provided to MHLS before retention hearings [FN8]. Thus, MHLS is entitled to relief on its petition only if some provision of article 9 or of the regulations of OMH (14 NYCRR [Department of Mental Hygiene]) "requires" the production of a copy of the patient's complete medical chart as the "accompanying data" to be given to MHLS before a retention hearing. Again, contrary to the majority's view, no such provision can be found, either in article 9 or in the OMH regulations.
Neither the majority nor MHLS contends that anything in article 9 directly "requires" that MHLS be given a copy of the patient's complete medical chart before a retention hearing. Instead, MHLS argues, with the majority's agreement, that such a requirement can be derived from 14 NYCRR 501.2(a). This regulation — the only regulation that it is contended to furnish support for MHLS's position and the majority's result — provides:
"For purposes of this Title [14 NYCRR (Department of Mental Hygiene)]:
(a) Case record, clinical record, medical record, or patient record means clinical record as such term is defined in section 33.16 of the Mental Hygiene Law, whether created or maintained in writing or electronically. All such records shall use accepted mechanisms for clinician signatures, be maintained in a secure manner, and be readily accessible to [OMH] upon request."
Although overlooked by the majority, 14 NYCRR 501.2(a) refers not to the word "record" — the term used in article 9 of the Mental Hygiene Law — but to the italicized two-word phrases in the provision, as quoted just above. None of those two-word phrases is used in article 9. This confirms that 14 NYCRR 501.2(a) was not intended to define the term "record" as used in article 9.
Mental Health Law § 33.16, to which 14 NYCRR 501.2(a) refers, provides in pertinent part:
"(a) Definitions. For purposes of this section:
"1. Clinical record' means any information concerning or relating to the examination or treatment of an identifiable patient or client maintained or possessed by a facility which has treated or is treating such patient or client . . . ."
The flaw in the majority's reasoning is that neither 14 NYCRR 501.2(a) nor Mental Health Law § 33.16 defines the term "record" for the purpose of prescribing the "accompanying data" of which MHLS must be "given" a copy (implicitly, at the facility's expense) pursuant to Mental Health Law § 9.31(b)[FN9]. Part 501 of 14 NYCRR, of which 14 NYCRR 501.2 is the definitional section, is entitled "Mental Health Services — General Provisions." Consistent with that title, part 501 deals with the general functions of OMH, and does not contain a single reference to article 9 of the Mental Health Law, to any section of article 9, to retention hearings, or to involuntarily admitted patients. While the definitions set forth in 14 NYCRR 501.2 apply to title 14 in its entirety, it appears that no regulations governing retention hearings pursuant to article 9 of the Mental Health Law have been promulgated. As for Mental Health Law § 33.16, the statute to which 14 NYCRR 501.2(a) refers, that statute is entitled "Access to clinical records," and, as previously discussed, defines the term "clinical record" solely for purposes of setting forth the rules governing access to such material and protecting the privacy of patients in general [FN10]. Like 14 NYCRR part 501, Mental Health Law § 33.16 does not contain a single reference to article 9, to any specific section of article 9, to retention hearings, or to involuntarily admitted patients.
The majority's result is not supportable because Mental Health Law § 9.01 — which does define the term "record" as used in section 9.31(b) — incorporates by reference only those OMH [*11]regulations, if any, that "require[]" a hospital to provide MHLS with any "accompanying data" in advance of a retention hearing, and neither the majority nor MHLS identifies any such regulation. Section 9.01 does not refer to material "defined" as part of a patient record in OMH regulations for any conceivable purpose, but to material "required" by such regulations to be included in the record to be copied and provided to MHLS in the specific context of a retention hearing under article 9. Nothing in 14 NYCRR 501.2(a) or Mental Health Law § 33.16(a)(1), which define patient records for other purposes, can reasonably be construed to give rise to such a requirement.
The majority resists the conclusion I reach — that MHLS, while entitled to copy for itself any part of a patient chart it needs to represent that patient at a retention hearing, has no right to demand that BPC (or any similar facility) bear the expense of providing MHLS with a copy of the entire chart — essentially by conflating the right of access to the chart (which MHLS has under section 47.03[d], and which the patient has under section 33.16) with MHLS's more limited right, under section 9.31(b), to be "given" by BPC a copy of the "record" as defined by section 9.01. Thus, the majority's statement that my approach is "inconsistent with the purpose of Mental Health Law § 33.16" is a non sequitur, because section 33.16 simply does not address what material a facility is obligated to copy and provide to MHLS, at the facility's expense, before a retention hearing, and no statute or regulation addressing that obligation refers to the definition of "clinical record" in section 33.16 [FN11]. Again, it is undisputed that BPC honors the right of MHLS, under section 47.03(d), to inspect the chart of any patient it represents whenever it wants, and to copy as much of that chart as it sees fit. However, there is simply no provision of law that authorizes this Court to shift from MHLS to BPC the expense of copying an entire patient chart for MHLS's benefit.
The majority distorts the rather humdrum issue presented by this appeal — which of two publicly funded agencies must bear the expense of copying a patient's entire chart in advance of a retention hearing — by suggesting — groundlessly — that my approach would require "indigent patients . . . [to] surrender . . . [their] rights [to access and copies of their clinical records] when the mental health facility seeks to retain the patient for involuntary psychiatric care." To reiterate, because MHLS has round-the-clock access to each patient's chart and can make whatever copies it wants for itself, no issue of due process arises in this matter. Petitioner here is not an indigent patient seeking a copy of his or her chart, but MHLS, a state agency with its own budget and employees [FN12]. I fully appreciate that MHLS's resources are limited, but so are those of [*12]BPC, and, as a result of the majority's decision, the latter will have to shift resources from patient care to photocopying. Nothing in the Mental Hygiene Law or relevant regulations warrants this shifting of part of the cost of MHLS's operation to BPC. If there is to be a change in this state of affairs, involving staffing and budgetary allocations, it should be accomplished by legislative action, not by judicial dictate.[FN13]
I take exception to the majority's groundless attribution to me of the "narrow view" that patients have no interest in MHLS's access to their records, and to the majority's accusation that I "ignore[] . . . that MHLS's duties and the patient's rights are inextricably interwoven." Of course, at a retention hearing, the real party in interest is the patient, and, whatever the extent of BPC's obligation to provide MHLS with copies of patient records, that obligation exists for the patient's benefit. What the majority refuses to see is that the Mental Hygiene Law sets forth different rules for a patient's right of access to his or her chart, depending on whether the patient is acting pro se (or through a representative other than MHLS) (§ 33.16) or, on the other hand, through MHLS as his or her legal representative (§§ 9.31[b], 47.03[d]). In fact, the patient's rights of access to his records, and to have copies of them made, are significantly greater when MHLS acts on the patient's behalf [FN14]. There is nothing sinister about this, as MHLS's around-the-[*13]clock ability, on behalf of a patient, to inspect his or her records, and to copy for itself as much of the chart as it deems necessary to fulfill its duties, plainly fulfills the requirements of due process of law. Certainly, neither the majority nor MHLS has made even a colorable argument to the contrary.[FN15]
Plainly, in view of MHLS's rights of access and to make copies under Mental Hygiene Law § 47.03(d), OMH's limited interpretation of the material required to be "give[n]" to MHLS before a retention hearing pursuant to § 9.31(b) is rational, reasonable and constitutional. MHLS therefore should prevail in this proceeding only if there is some provision in the Mental Hygiene Law, or in the regulations promulgated thereunder, that requires a facility, through its own employees, to copy a patient's entire chart (which, again, typically comprises hundreds of [*14]double-sided pages) for MHLS, and to do so within the very brief time frame (a matter of days) between a patient's request for a retention hearing and the scheduled time of the hearing [FN16]. Neither MHLS nor the majority has identified any such provision.
Although I would not hesitate to join the majority if MHLS had demonstrated a "clear legal right" (Bloomberg, 6 NY3d at 388) to the relief it seeks (which it has not), the record establishes that the requirement the majority unjustifiably imposes on BPC is burdensome, wasteful and virtually unworkable. According to the affirmation of an assistant attorney general having more than 10 years of experience in these matters, article 9 hearings are scheduled for about 30 patients at BPC in a typical week, as previously noted. The affirmation further explains:
"Many of the charts are voluminous and to prepare copies prior to any potential hearing would require BPC to begin copying at least a week in advance, depending on the current workload of the records department at BPC, the size of the charts, and the number of charts that need to be copied. Even then, to prepare the copies, BPC would also likely need to hire additional staff or arrange overtime, as well as to buy additional machinery to process the copies. And any copy prepared in advance of a hearing would necessarily not contain the most recent medical treatment notes relevant to a patient and would have to be updated again on the date of the hearing. Even with additional staff and machinery, however, it is likely not possible to guarantee that the records department would be able to provide new and updated copies of all of the charts on the day of the hearing in time for that day's calendar."
The wastefulness of the requirement imposed by the majority is evident from the fact that, according to the same assistant attorney general, two-thirds of the matters scheduled be heard during a typical week do not proceed to a hearing because they are adjourned or withdrawn. In addition, given the length of the typical chart, it is unlikely that MHLS will require a copy of every single page to represent the patient at the hearing. Requiring MHLS to bear the expense, out of its own budget, of copying patient records provides it with an incentive to copy only the portions of patient charts it actually believes it might need. BPC, as MHLS's adversary in retention hearings, obviously cannot make this determination on MHLS's behalf.
The majority's assertion that it is not wasteful to require the copying of material for a hearing that does not go forward is meritless. Since MHLS has round-the-clock access to patient [*15]records, the copying is not required for its attorneys to review the charts before the hearings, and if a hearing ultimately is not held, any copying will have been a waste of time and resources. Further, to reiterate, even for a hearing that does go forward, it is extremely unlikely that more than a few pages (if that) of these extensive, minutely detailed charts will have a bearing on the question to be determined. My concern for the public fisc — as well as my recognition of the limits of judicial power — preclude me from joining the majority in imposing on BPC a costly new obligation that is unlikely to improve the quality of the representation provided to patients in article 9 hearings, and will certainly not improve the quality of their care.
The majority concludes its opinion by reciting how burdensome it would be for MHLS to copy the patient's entire medical chart for each scheduled article 9 hearing. While I do not dispute that doing this would present a difficult burden for MHLS, I note — once again — that copying so much material, within the severe time constraints imposed by article 9, would be similarly burdensome for BPC. No less than MHLS, BPC "can ill-afford to spend the extra time and effort required" (to quote the majority) to copy so much material. No doubt this is why, after decades of operating under article 9 (and apart from isolated, and unsuccessful, demands made in a few particular cases about a decade ago, as discussed in footnote 4 above), MHLS has only recently sought judicial relief based on its current claims (1) that it needs a complete copy of a patient's entire medical chart to represent that patient in an article 9 hearing and (2) that hospitals are obligated by statute to provide it with a complete copy of that chart.[FN17]
In any event, the question presented here is which of two taxpayer-funded public agencies — MHLS or BPC — must bear the burden and expense of the extensive physical reproduction of paper records that MHLS now claims to need — unconvincingly, in my view — under current law, as embodied in duly enacted statutes and duly promulgated regulations. As I have already explained, nothing in the existing statutory or regulatory framework shifts this burden and expense of MHLS's operation from MHLS itself to BPC, requiring BPC to divert its limited resources from the treatment of "the most vulnerable members of our society" to mostly useless photocopying of reams of paper. It is the prerogative of the legislature, not this Court, to effect any change in this situation — and to provide the requisite funding.
It may well be that the simplest solution of this dispute would be for all mental health facilities to be provided with sufficient funding to upgrade to digital record keeping, which [*16]would permit complete patient charts to be transmitted electronically or printed out automatically, at far less cost in terms of both time and money than the photocopying of paper documents. As previously noted, some institutions already have undergone this conversion. However, whether to provide funding out of limited public resources for every public mental health facility to do the same is a political determination that should be made by the elected branches of government, which are charged with allocating limited public resources among the myriad needs and wants of society that press upon the state. The solution does not properly lie in a writ of mandamus, "an extraordinary remedy which lies only . . . where there is a clear right to the relief sought" (Spring Realty Co. v New York City Loft Bd., 69 NY2d 657, 659 [1986] [internal quotation marks omitted]). The Court of Appeals has cautioned that "courts must be careful to avoid . . . the fashioning of orders or judgments that go beyond any mandatory directives of existing statutes and regulations and intrude upon the policy-making and discretionary decisions that are reserved to the legislative and executive branches" (Klostermann v Cuomo, 61 NY2d 525, 541 [1984]). In affirming the grant of a writ of mandamus in this case, the majority fails to heed this principle.
For all of the foregoing reasons, I conclude that petitioner has not clearly established (see Bloomberg, 6 NY3d at 388) that BPC has "failed to perform a duty enjoined upon it by law" (CPLR 7803[1]), and therefore respectfully dissent from the affirmance of the order appealed from.
Order, Supreme Court, Bronx County (Ben R. Barbato, J.), entered December 16, 2016, affirmed, without costs.
All concur except Friedman, J.P. and Andrias, J. who dissent in an Opinion by Friedman, J.P.
Friedman, J.P., Renwick, Andrias, Moskowitz, Gesmer, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: DECEMBER 12, 2017
CLERK



Footnotes

Footnote 1: For the purpose of clarity, respondent will be referred to as BPC.

Footnote 2: In support of its view that no "due process" concerns are implicated in this case, the dissent cites to a footnote in an affirmation by an assistant attorney general alleging, without any basis other than his 10-year memory, that "[o]n a few occasions in 2007 and 2008, the MHLS office at BPC made the same demand [made in this proceeding], and [Supreme Court] denied MHLS's requests."
Unpublished, unsubstantiated judicial determinations by lower courts, as alleged by the assistant attorney general and relied upon by the dissent, are inappropriate subjects of stare decisis and have no precedential value before this Court. More importantly, the attorney for MHLS clearly assailed the assistant attorney general's allegations as events that never took place. Specifically, in direct response to the allegations, the attorney for MHLS stated:
"I have been associated with MHLS for 30 years and I don't recall this issue coming up. I don't recall any court ever determining this issue so, if he has something specific or a transcript, I would love to see it because I have no recollection of that happening. And, in fact, I was the principal attorney in charge of the Bronx office when that happened. So I have no idea what he is referring to there. I also think if you read the footnote [where the allegations were made] it seems to be a contradiction because although he says that MHLS made this same demand and this Court denied the demand, he said MHLS never demanded copies of patient's charts in advance of hearings and no Court told us that we have to provide such copies ...."
That the assistant claimed to recall a specific occasion added nothing. Here, no credence can or should be given to the assistant's failed attempt to convince the court below to follow judicial determinations that allegedly took place a decade ago and of which neither opposing counsel nor the court below was aware or acknowledged taking place. Without any transcript, case name, index number, or date, the attorney claimed to recall two instances occurring 10 years before the instant proceeding. If a judicial determination is to have any value one cannot simply claim it to be so without citation.

Footnote 3: The procedures for retention hearings are more fully described in the majority opinion.

Footnote 4: I note that this issue arises because BPC still maintains its patients' medical charts on paper.

Footnote 5: Because I conclude that the petition is without merit even if MHLS has standing to bring this proceeding, I express no opinion on the question of whether MHLS has such standing.

Footnote 6: As to whether this matter raises any due process issue, it bears mention that the record contains an affirmation by an assistant attorney general stating: "On a few occasions in 2007 and 2008, the MHLS office at BPC made the same demand [made in this proceeding], and [Supreme Court] denied MHLS's requests." While, as the majority points out, an MHLS attorney stated at a subsequent oral argument that he did not recall any such occasion, the assistant attorney general, in response, represented to Supreme Court that he specifically recalled two instances in which MHLS demanded a complete copy of the chart before a hearing went forward and, in each instance, the court rejected the demand. That the MHLS attorney stated that he did not "recall this issue coming up" does not contradict the assistant attorney general's statement that he did recall instances in which the issue was raised — a recollection that, on my reading of the record, was substantiated — and certainly does not undermine the assistant attorney general's credibility. Moreover, while I agree that such unreported rulings are not relevant to the statutory and regulatory issues presented, they are appropriately mentioned in connection with the due process issue that the majority claims to arise here, because presumably such an issue would have been evident to Supreme Court on those prior instances.

Footnote 7: Unlike the majority, MHLS itself does not contend that section 33.16 is the source of an obligation of BPC to provide MHLS with complete copies of patient charts. If that were MHLS's contention, it would necessarily have to aver its readiness to pay, out of its own budget, the fee BPC charges for paper copies under that statute. Nowhere in the record or in its appellate brief has MHLS expressed such readiness.

Footnote 8: Thus, there is no substance to the majority's purported concern that my construction of Article 9 would give OMH "absolute discretion to obviate the statute's requirement to provide a patient with accompanying data' at a retention hearing." OMH's reasonable interpretation of the term "accompanying data" in section 9.01 is entitled to deference from a reviewing court (see Matter of Natural Resources Defense Council, Inc. v New York State Dept of Envtl. Conservation, 25 NY3d 373, 397 [2015]).

Footnote 9: To repeat myself, reading these provisions as they are written creates absolutely no issue of due process, since MHLS admits that BPC affords it access to all patient records, and the ability to copy such records for itself, around the clock, pursuant to Mental Health Law § 47.03(d). I hesitate to restate this point multiple times, but it deserves emphasis because it constitutes one of the fundamental disagreements between the majority and myself.

Footnote 10: As also previously discussed, MHLS does not claim that BPC has denied it access to any part of the records of any patient or the ability to copy such records.

Footnote 11: By the same token, "the clear mandates" of Mental Hygiene Law § 33.16, to which the majority refers, have no application to the question presented by this appeal. The irrelevance of section 33.16 to this inquiry is highlighted by the fact that, as previously noted, it authorizes BPC to impose a charge for copying — while no charge is authorized by section 9.31(b) for the copying of the material required to be produced in advance of a retention hearing. Similarly, while section 33.16(b)(5) requires BPC to furnish a patient with a copy of a record "within a reasonable time" of the patient's request, MHLS, as previously noted, is entitled, under section 47.03(d), to inspect a patient's chart and make for itself any copies it wishes at any time of day or night.

Footnote 12: At the risk of stating the obvious, I note that MHLS is not an indigent patient only to highlight the fact that, unlike an indigent patient himself or herself, MHLS can, on the patient's behalf, send an attorney or other employee to a ward or record room at BPC to inspect a chart, and to copy as much of it as may be deemed relevant and necessary, at any time. The majority seems to be suggesting — quite unfairly — that I take the position that MHLS's access to patient records is of no concern to the indigent patients it represents. Obviously, I take no such position. What is utterly irrelevant to the statutory and constitutional rights of an indigent patient, however, is whether the cost, in time and money, of copying his or her chart for MHLS's use at an article 9 hearing comes out of MHLS's budget or BPC's budget. That is the mundane question raised by this proceeding — from which pocket will the state draw the money to pay for photocopying a patient's chart?

Footnote 13: Contrary to the majority's assertion, I make no suggestion that the majority is unaware of the budgetary constraints under which BPC operates. Rather, I call attention to the majority's usurpation of the function of allocating the costs of retention hearings between these two contending governmental actors — a function that plainly belongs to the political branches, not to the judiciary.

Footnote 14: Unlike MHLS, patients and their representatives other than MHLS ("qualified person[s]," as defined in Mental Hygiene Law § 33.16[a][6]) are not granted around-the-clock access to charts (see § 33.16[b][7] ["A facility may place reasonable limitations on the time, place, and frequency of any inspection of clinical records"]). In addition, as previously noted, a facility is permitted to impose a charge of up to 75 cents per page for copies on qualified persons having the ability to pay (see § 33.16[b][6]), but no such charge is authorized for copying by MHLS in § 47.03. Further, a patient's or other qualified person's access to records, unlike that of MHLS, is subject to possible limitation for clinical reasons (see § 33.16[c]). The majority refers more than once to the requirement of § 33.16(b)(5) that a facility fulfill "within a reasonable time" the request of a qualified person for a copy of a record. However, the "reasonable time" requirement does not appear in the statute addressing MHLS's rights of access to patient records (§ 47.03) because MHLS, as previously noted numerous times, can make copies of the records for itself at any time of the day or night.

Footnote 15: The majority emphasizes MHLS's vague complaint that, in early 2016, its attorneys "began to notice" that documents "had been added or removed" from charts that were entered into evidence at retention hearings "on several occasions." To begin, the attorneys could have noticed such discrepancies at hearings only because they had reviewed the charts before the hearing, at which time they could have copied any significant pages for themselves. Further, if an MHLS attorney notices that material portions are missing from a chart that the hospital offers into evidence at a hearing, the attorney should raise the matter with the judge, who has the power to resolve the issue as it arises in a particular case. As for new matter added to a chart between the time of MHLS's last review and the hearing, requiring production of a hard copy of the chart in advance of the hearing will not solve this problem, as the majority itself acknowledges that new material is added to a chart each day. Thus, even when BPC, in compliance with the majority's order, produces a copy of a chart to MHLS days in advance of hearing, there will still be new pages of the chart to be brought to the hearing that were not previously produced to MHLS. This being the case, I fail to see the logic of the majority's view, expressed at the end of its opinion, that the unavoidable addition of these new pages somehow turns BPC's failure to provide a complete paper copy of the chart to MHLS in advance of a hearing into a violation of the patient's due process rights.

Footnote 16: A facility is required, upon receipt of written notice of a request for a hearing, to "forward forthwith" a copy of the request to the appropriate court (Mental Hygiene Law § 9.31[b]), and the court is then required to set a time for the hearing "not later than five days from the date" the court received the notice (§ 9.31[c]). I note that the majority offers no grounds for its apparent belief that the short period between a patient's request for a retention hearing and the scheduled time of the hearing constitutes a "reasonable time" within which BPC should be expected to produce a copy of the entire clinical chart for each patient for whom an article 9 hearing is scheduled during a given week. In this regard, I note that the record reflects that, typically, about 30 article 9 hearings per week are scheduled at BPC.

Footnote 17: That certain institutions have begun voluntarily providing MHLS with complete copies of medical charts is irrelevant to the question of whether doing so is legally required. The majority's implicit admission that this is a recent innovation (it writes that these institutions "have begun to comply with MHLS's demand" [emphasis added]) strongly suggests that compliance with MHLS's request is not legally required, given that the majority points to no corresponding change in statutory or regulatory law. Moreover, it appears that the hospitals that provide MHLS with complete copies of the chart may be able to do so because — unlike BPC — they have the resources to maintain their records in electronic form. I further note that it is odd for the majority to suggest that MHLS does not have the resources to "review" patient charts itself, since — whether MHLS reviews the original charts where they are kept or reviews copies of the charts, should they be provided by BPC, in MHLS's own office — MHLS must conduct its own independent review of the records.